CITY OF CINCINNATI, APPELLEE, *v.* OHIO COUNCIL 8, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO, ET AL., APPELLANTS.

[Cite as *Cincinnati v. Ohio Council 8, American Fedn. of State, Cty. & Mun. Emp., AFL–CIO* (1991), 61 Ohio St.3d 658.]

(No. 90-544—Submitted February 6, 1991—Decided August 27, 1991.)

*Richard A. Castellini,* city solicitor, and *Mark C. Vollman,* for appellee.

*Ronald H. Janetzke; Kirschner, Weinberg & Dempsey, Larry P. Weinberg* and *Robert D. Lenhard,* for appellants.

HERBERT R. BROWN, J. This case presents two issues for our determination: (1) whether, under R.C. Chapter 4117, the Public Employees' Collective Bargaining Act, a provision in a collective bargaining agreement prevails over a conflicting provision in a municipal home-rule charter, and (2) whether the collective bargaining agreement at issue here requires the city to deduct contributions to PEOPLE. For the reasons which follow, we answer the first query in the affirmative, but find that the record does not contain sufficient evidence to resolve the second, and remand for further proceedings.

I

Home–Rule Charters and R.C. 4117.10(A)

Before the Collective Bargaining Act became effective, a collective bargaining agreement between a public employer and its employees was enforceable only to the extent that it was not contrary to law. See *Struthers City Schools Bd. of Edn. v. Struthers Edn. Assn.* (1983), 6 Ohio St.3d 308, 6 OBR 368, 453 N.E.2d 613; *Dayton Classroom Teachers Assn. v. Dayton Bd. of Edn.* (1975), 41 Ohio St.2d 127, 70 O.O.2d 223, 323 N.E.2d 714. Under the old rule, public employers sometimes attempted to avoid their responsibilities under collective bargaining agreements by asserting that a particular provision was "contrary to law"—particularly where the provision in question gave employees greater rights than those provided by statute. See, *e.g., Findlay City School Dist. Bd. of Edn. v. Findlay Edn. Assn.* (1990), 49 Ohio St.3d

129, 551 N.E.2d 186. More frequently, confusion over just what was or was not "contrary to law" led to protracted litigation.

The Collective Bargaining Act, most specifically R.C. 4117.10(A), completely changed this rule. That statute provides, in pertinent part:

" * * * Laws pertaining to civil rights, affirmative action, unemployment compensation, workers' compensation, the retirement of public employees, residency requirements, the minimum educational requirements contained in the Revised Code pertaining to public education including the requirement of a certificate by the fiscal officer of a school district pursuant to section 5705.41 of the Revised Code, and the minimum standards promulgated by the state board of education pursuant to division (D) of section 3301.07 of the Revised Code prevail over conflicting provisions of agreements between employee organizations and public employers. * * * "

This provision lists laws which prevail over a conflicting provision in a collective bargaining agreement. "Under the principle of statutory construction that inclusion of a list of items will exclude other items not on the list, the remaining thousands of state and local laws which may conflict with the contracts, do not prevail over those contracts." O'Reilly, Ohio Public Employee Collective Bargaining (1984) 176; see, also, Lewis & Spirn, Ohio Collective Bargaining Law (1983) 70; Larson, Ashmus, Bumpass & Ward, Public Sector Collective Bargaining: The Ohio System (1984) 69. R.C. 4117.10(A) simplifies contract administration by eliminating concern over whether an agreement is "contrary to law," and encourages honesty and good faith in collective bargaining by requiring the parties to live up to the agreement they make.

R.C. Chapter 4117, of which R.C. 4117.10(A) is a part, is a law of a general nature which is to be applied uniformly throughout the state. *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44, v. State Emp. Relations Bd.* (1986), 22 Ohio St.3d 1, 22 OBR 1, 488 N.E.2d 181. As such, it prevails over any inconsistent provision in a municipal home-rule charter by virtue of Section 3, Article XVIII of the Ohio Constitution. See, *e.g., Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 48–49, 2 OBR 587, 590–591, 442 N.E.2d 1278, 1281–1282, and cases therein cited. We have also recognized that R.C. Chapter 4117 prevails over home-rule charters because it was enacted pursuant to Section 34, Article II of the Ohio Constitution. *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 13–18, 539 N.E.2d 103, 114–118. Thus, the language in R.C. 4117.10(A) is applicable to collective bargaining agreements executed by a home-rule city. By virtue of this provision, where the agreement conflicts with any local law, including the charter itself, the agreement prevails unless the conflicting local law falls into one of the specific exceptions listed in the statute. We so hold,

and specifically disapprove of *Ebbing v. Hamilton* (1985), 29 Ohio App.3d 69, 29 OBR 79, 502 N.E.2d 661, to the extent that it reached a contrary conclusion.

## A

### *"Permissive" Subjects of Collective Bargaining*

The court below recognized the supremacy principle discussed above, but concluded that it was inapplicable to the instant case because the PEOPLE checkoff provision is not a mandatory subject of bargaining as defined in R.C. 4117.08(A).[1] The court stated:

"Employee check-off deductions for a political fund are not matters 'pertaining to wages, hours, or terms and other conditions of employment.' Therefore, these check-off provisions are not appropriate subjects for collective bargaining, and public employees have no 'right' to bargain collectively with their employer on these matters.

" * * *

" * * * [The 'Little Hatch Act,' Section 4, Article V of the city's charter,] does not 'impair, limit or negate' the Ohio Public Employees' Collective Bargaining Act because R.C. Chapter 4117 does not give public employees the right to collectively bargain the matters covered by this provision."

The court below appeared to conclude that bargaining on any subject not listed in R.C. 4117.08(A) is outside the scope of R.C. Chapter 4117. This conclusion results from a misunderstanding of the scope of collective bargaining permitted under that chapter.

As a general principle of labor law, there are three classifications of collective bargaining subjects. "Mandatory" subjects are those which the applicable statute requires the parties to bargain over in good faith. See, generally, 1 The Developing Labor Law (2d Ed.1983) 761–771 (discussing the difference between "mandatory" and "permissive" subjects of bargaining under the National Labor Relations Act). The mandatory subjects of collective bargaining for those employment relationships governed by R.C. Chapter 4117 are listed in R.C. 4117.08(A). This statute provides that "[a]ll matters pertaining to wages, hours, or terms and other conditions of employment and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement are subject to collective bargaining between

---

1. AFSCME argues that the PEOPLE checkoff provision is a mandatory subject of bargaining. We need not determine this issue because, as explained *infra*, whether a term is "mandatory" or "permissive" is irrelevant for purposes of applying R.C. 4117.10(A).

the public employer and the exclusive representative, except as otherwise specified in this section." It is an unfair labor practice for either the employer, R.C. 4117.11(A)(5), or the employee representative, R.C. 4117.11(B)(3), to refuse to "bargain collectively * * *." R.C. 4117.01(G) defines "[t]o bargain collectively" as " * * * to perform the mutual obligation of the public employer, by its representatives, and the representatives of its employees to negotiate in good faith at reasonable times and places with respect to wages, hours, terms and other conditions of employment and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement * * *." Thus, both parties have a duty to bargain in good faith over mandatory subjects of bargaining.

Conversely, there are certain provisions which, by law, cannot be included in a collective bargaining contract. For example, under R.C. 4117.09(C), no agreement may require membership in an employee organization as a condition of employment. These are sometimes referred to as "illegal" subjects of bargaining. An illegal provision in a collective bargaining agreement, like any illegal contract, is void and unenforceable. See, *e.g., State v. Executor of Buttles* (1854), 3 Ohio St. 309, paragraph seven of the syllabus.

Between these extremes, there is a range of matters known as "permissive" subjects of bargaining. A permissive subject is one whose inclusion in the agreement is not prohibited by law, but which is also not a mandatory subject of bargaining. See, generally, 1 The Developing Labor Law, *supra,* at 761. While parties to a collective bargaining relationship are required to bargain over mandatory subjects, they are not required to bargain over permissive subjects, though nothing prevents them from doing so. Indeed, the possibility of bargaining over permissive subjects is expressly recognized in R.C. 4117.08(C).[2] The only constraint on permissive bargaining is that it is impermissi-

---

2. R.C. 4117.08(C) provides:

"Unless a public employer agrees otherwise in a collective bargaining agreement, nothing in Chapter 4117. of the Revised Code impairs the right and responsibility of each public employer to:

"(1) Determine matters of inherent managerial policy which include, but are not limited to areas of discretion or policy such as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, and organizational structure;

"(2) Direct, supervise, evaluate, or hire employees;

"(3) Maintain and improve the efficiency and effectiveness of governmental operations;

"(4) Determine the overall methods, process, means, or personnel by which governmental operations are to be conducted;

"(5) Suspend, discipline, demote, or discharge for just cause, or lay off, transfer, assign, schedule, promote, or retain employees;

"(6) Determine the adequacy of the work force;

"(7) Determine the overall mission of the employer as a unit of government;

ble to insist to the point of impasse on inclusion of a permissive subject in an agreement. *Natl. Labor Relations Bd. v. Borg–Warner Corp.* (1958), 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823, 828–829. If, however, the parties choose to bargain on a permissive subject, and reach agreement on a provision relating to it, the provision is just as much a part of the contract (and therefore just as enforceable) as a provision governing a mandatory subject of bargaining.

## B

### *Permissive Contract Provisions and R.C. 4117.10(A)*

As we have noted, R.C. 4117.10(A) provides that the terms of a collective bargaining agreement prevail over any conflicting laws except those specifically exempted therein. The statute makes no distinction between "mandatory" and "permissive" subjects of bargaining—*all* terms of an agreement are entitled to this statutory grant of supremacy. Given that the inclusion of permissive subjects in a collective bargaining agreement was clearly foreseen and permitted by the General Assembly, it would violate the legislative intent to construe the statute differently. Accordingly, we now hold that the language of R.C. 4117.10(A) which provides that collective bargaining agreements generally prevail over conflicting laws applies equally to contract provisions encompassing mandatory subjects of bargaining and those encompassing permissive subjects of bargaining.

## C

### *R.C. 4117.10(A) and Municipal Home Rule*

The city further argues that "[t]o allow provisions of a collective bargaining agreement to supersede the City Charter would be in effect to endanger the system of municipal home rule. * * * " However, we do not believe that reading the statute to mean what it says will eliminate home rule by judicial fiat. Under our holding today, no city is under any obligation to sign a

---

"(8) Effectively manage the work force;

"(9) Take actions to carry out the mission of the public employer as a governmental unit.

"The employer is not required to bargain on subjects reserved to the management and direction of the governmental unit except as affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement. A public employee or exclusive representative may raise a legitimate complaint or file a grievance based on the collective bargaining agreement."

These are the permissive subjects for bargaining designated by statute. It is significant that, while this statute establishes that there is no duty to bargain over the enumerated subjects, it does not prohibit such bargaining. Similarly, there should be no bar to bargaining over permissive subjects not enumerated in the statute.

collective bargaining agreement which conflicts with its charter. So long as it bargains in good faith, the city may lawfully "just say no" to any proposal from the employee representative which conflicts with the charter, be it on a "mandatory" or "permissive" subject of bargaining. R.C. 4117.01(G) (" * * * The obligation to bargain collectively does not mean that either party is compelled to agree to a proposal * * * "); see, also, *Natl. Labor Relations Bd. v. Borg–Warner, supra,* at 349, 78 S.Ct. at 722, 2 L.Ed.2d at 828–829 (under the pertinent provisions of the National Labor Relations Act (Section 158[a][5], [b][3] and [d], Title 29, U.S.Code), which closely parallel R.C. 4117.11(A)(5), (B)(3) and 4117.01(G), parties are required to bargain over mandatory subjects, but " * * * neither party is legally obligated to yield").

## II

### Effect of the "Legality" Provision

If the collective bargaining agreement contained only the PEOPLE checkoff provision, our inquiry would be at an end. However, the 1981 collective bargaining agreement contained a further provision stating that it was the intent of the parties to "comply, in every respect, with applicable * * * charter requirements * * *." In effect, this language incorporates the charter into the agreement and overrides the operation of R.C. 4117.10(A).[3] Thus, under this provision of the agreement, the PEOPLE checkoff requirement is invalid to the extent it violates the charter—including, most specifically, the Little Hatch Act. However, even after taking this provision into account, we are still unable to resolve the instant case.

---

3. Many collective bargaining agreements contain "legality" or "contrary to law" clauses which provide for the renegotiation of provisions in the agreement which are found to be legally invalid. See, *e.g.*, *State, ex rel. Williams, v. Belpre City School Dist. Bd. of Edn.* (1987), 41 Ohio App.3d 1, 3, 534 N.E.2d 96, 99. Such language, standing alone, does not establish that the parties intended to override the operation of R.C. 4117.10(A). *Id.* at 7–8, 534 N.E.2d at 102–103.

In the instant case, however, the "legality" clause also recites that "[i]t is the intent of the City and the Union that this Agreement comply, in every respect, with applicable * * * charter requirements * * *." The effect of this language is to achieve a result similar to the status of Ohio law before the enactment of the Collective Bargaining Act, *i.e.*, to elevate statutory or other extracontractual law over the provisions of the agreement itself. See, generally, *Struthers City Schools, supra* (provisions of teachers' collective bargaining agreement valid if not in conflict with statutes governing teacher employment); *Dayton Classroom Teachers, supra* (grievance arbitration procedure in collective bargaining contract valid so long as arbitrator is not empowered to render an award contrary to law).

With the enactment of R.C. 4117.10(A), "legality" clauses such as in the instant case are no longer necessary to preserve the enforceability of the agreement when it conflicts with other law. However, employers and employee organizations are still free to adopt them in their agreements, and they continue to be valid and enforceable.

A

## Scope and Purpose of the Little Hatch Act

The Little Hatch Act was enacted by referendum as part of a comprehensive revision of the Cincinnati City Charter in 1926. At that time, Cincinnati's elected city government had been severely corrupted by spoils-system politics. As one prominent reformer recalled:

"The real government of the city was exercised by the machine through the ward and precinct organization. * * *

"[Every] voting precinct was in charge of a precinct committeeman who was almost invariably a public employee. He was expected to see to it that all the voters necessary to control a primary went to the polls on the day of such an election. In his precinct, curiously enough, there would generally be found approximately nine or ten more public employees. It was a condition of holding a job that each of these should produce his own vote and three or four more on the day of the primary. It was the duty of the precinct committeeman to see to this accomplishment, and that, too, was a condition of his continuing to hold his job * * *.

"The precinct executive, as he was called, was expected to know the names of all the voters in his precinct, their business, their prejudices, their faults; in fact, everything that was to be known about them. It was the way and policy of * * * [the machine politicians] to know those things which would most effectively influence votes. If the individual was a business man without anything about him that he would prefer to keep hidden from his family or other individuals, then it was always true that there were some privileges to be given by the city which meant value to his business, such, for instance, as the right to store goods on the sidewalk. Always there was the question of the valuation of his house or business premises for tax purposes. He might have an elevator in his building, and the elevator inspector, if friendly, might avoid the necessity of requiring a new cable. * * * If this was the picture for one precinct, you only need multiply it by five hundred in order to find springing to arms overnight an army of five thousand men controlling twenty-five thousand votes and more in a pinch, having one object only, and that the successful nomination of those suggested to them by the controlling committee which distributed their jobs. * * * " Charles P. Taft, City Management: The Cincinnati Experiment (1933) 25–27.

The new charter replaced the patronage system with a council-manager plan of government. The role of the Little Hatch Act in the reform program was to divorce the daily work activities of city employees from the process of electing the public officials who directed them. After the charter reforms

were enacted, "[the new administration] demobilized the army of the old machine by enforcing the Civil Service laws and forbidding any employee in the administrative service to participate in political activities. In depriving the old organization of the use of office holders for political work, a large part of the power of that organization was destroyed, and by depriving the City Charter Committee[, the organization which had led the reform movement,] of the power of patronage, the growth of a new machine as the result of the victory was prevented." Stegner, Cincinnati Awakens: Henry Bentley and the City Charter Committee (1950) 61. One immediate effect was the elimination of "assessments"—involuntary deductions from city employees' pay which went to support the party in power. Taft, *supra,* at 111; Stegner, *supra,* at 61.

The policy of eliminating patronage is reflected in the language of the charter, which expressly enjoins city employees from making direct or indirect contributions " * * * for any political party or for any candidate." By negative implication, city employees are free to make contributions which are not "for any political party or for any candidate." The charter would not prohibit an employee from contributing to an organization which engages in lobbying or voter registration, or which campaigns for or against a referendum issue, or which exists to generally promote a particular ideology, or anything else which is not a political party or a candidate.[4]

---

4. We have previously defined a "political party" as " * * * an association of individuals whose primary purposes are to promote or accomplish elections or appointments to public offices, positions or jobs * * *." *State, ex rel. Corrigan, v. Cleveland–Cliffs Iron Co.* (1959), 169 Ohio St. 42, 44, 8 O.O.2d 7, 8, 157 N.E.2d 331, 333. " * * * The foremost objective of political parties is to exercise power through the election of party members to public office * * *." Renstrom & Rogers, The Electoral Politics Dictionary (1989) 204.

Interest groups, such as the National Right to Life Committee, Sierra Club, American Association of Retired Persons, Ohio Municipal League, American Civil Liberties Union, or Consumer Federation of America, are not political parties. " * * * The members act through the interest group to attempt to influence public policy. * * * An interest group is different from a political party in that it does not have the winning of elective office as its principal objective. * * * Although interest groups may endorse a particular candidate or officeholder, their support will remain only so long as that person helps advance the group's particular objectives. * * * " Renstrom & Rogers, *supra,* at 257–258. Since the passage of the Federal Election Campaign Act of 1971, most interest groups have employed political action committees ("PACs") such as PEOPLE as their primary means of supporting favored candidates. *Id.* at 279; see, generally, Drew, Politics and Money (1983) 8–11 (describing growth of PACs as a factor in American politics).

Given that the purpose of Cincinnati's Little Hatch Act is to prevent the establishment of a patronage system in city government, the phrase "political party" as used in the charter cannot be fairly read to encompass interest groups such as we have discussed here. Cf. *Heidtman v. Shaker Heights* (1955), 163 Ohio St. 109, 56 O.O. 171, 126 N.E.2d 138 (prohibition against "tak[ing] part in politics" in predecessor to R.C. 124.57 will be read as encompassing only partisan activities because the purpose of the statute is to eliminate political patronage from the

Under the language of the charter, the PEOPLE checkoff provision is invalid if PEOPLE funds are collected from city employees and given to "any political party" or "any candidate," since the Little Hatch Act prohibits both direct and indirect contributions.[5]  Conversely, as the city long ago conceded, the checkoff is valid if the funds are used for political purposes other than contributions to parties or candidates.  However, we cannot end the inquiry here.  Though the legality clause subordinates the collective bargaining agreement to the Little Hatch Act, it may only do so to the extent that the Little Hatch Act is constitutional.  Therefore, it becomes necessary to examine the constitutionality of the Little Hatch Act.

B

*Constitutional Questions Raised by the Little Hatch Act*

The First Amendment protects the right to make financial contributions to political candidates and causes.  *Buckley v. Valeo* (1976), 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659.  The Little Hatch Act, like the federal Hatch Act and other similar laws, limits the First Amendment right of public employees to engage in partisan politics in order to protect the efficiency and integrity of the public service.  *U.S. Civ. Serv. Comm. v. Natl. Assn. of Letter Carriers* (1973), 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796; *Gray v. Toledo* (N.D.Ohio 1971), 323 F.Supp. 1281, 1284–1285, 28 Ohio Misc. 141, 143–145, 57 O.O.2d 239, 241–242 (citing *United Public Workers v. Mitchell* [1947], 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754).  While this is a sufficient governmental interest to justify an encroachment on First Amendment rights, *Letter Carriers, supra; Gray, supra*, at 1285, 28 Ohio Misc. at 144–145, 57 O.O.2d at 241–242, not all restrictions on the political activities of government employees are automatically valid.  The Constitution requires that the restriction bear a direct relationship to this interest, and be the least restrictive means necessary to accomplish this end.  *Gray, supra*, at 1285, 28 Ohio Misc. at 145, 57 O.O.2d at 241–242 (citing *Fort v. Civ. Serv. Comm.* [1964], 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385; *Minielly v. State* [1966], 242 Ore. 490, 411 P.2d 69).

---

classified civil service).  Further, any attempt to prohibit public employees from joining or supporting nonpartisan interest groups would meet with serious constitutional difficulties.  See *Rosenfield v. Malcom* (1967), 65 Cal.2d 559, 55 Cal.Rptr. 505, 421 P.2d 697 (public employee may not be discharged for membership in civil rights group).

5.  It should be remembered that PEOPLE is a national PAC which collects funds from sources other than Cincinnati city employees.  There can be no violation of Cincinnati's Little Hatch Act unless funds *from Cincinnati* are contributed to candidates or political parties.

As noted *supra*, the objective of the Little Hatch Act is to prevent the emergence of a political patronage system in Cincinnati city government. In furtherance of that objective, it is unquestionable that the city may limit its employees' participation in local partisan politics without violating the Constitution. *E.g., Northern Ohio Patrolmen's Benevolent Assn. v. Wayne Cty. Sheriff's Dept.* (1986), 27 Ohio App.3d 175, 27 OBR 213, 500 N.E.2d 404; *Gray, supra; Ferguson Police Officers Assn. v. Ferguson* (Mo.App.1984), 670 S.W.2d 921.

Where a city or other unit of local government purports to prohibit its employees' participation in non-local partisan politics, the authorities are divided. Some courts have found such restrictions unconstitutionally overbroad, taking the view that participation by local government employees in politics at the state and national level does not threaten the integrity of the local government. See *Mancuso v. Taft* (C.A.1, 1973), 476 F.2d 187; *Hobbs v. Thompson* (C.A.5, 1971), 448 F.2d 456; *Kinnear v. San Francisco* (1964), 61 Cal.2d 341, 38 Cal.Rptr. 631, 392 P.2d 391; *Minielly, supra; Martin v. State Bd. of Elections* (1977), 119 R.I. 556, 381 A.2d 234. Other courts have upheld them, finding a sufficient interest to warrant the restrictions because support for non-local candidates might benefit local candidates or officeholders with similar political interests. See *Reeder v. Kansas City Bd. of Police Commrs.* (C.A.8, 1984), 733 F.2d 543; *Wachsman v. Dallas* (C.A.5, 1983), 704 F.2d 160; *Pollard v. Bd. of Police Commrs.* (Mo.1984), 665 S.W.2d 333. While our research has not uncovered a reported case involving an attempt by a state or local government to prohibit its employees from contributing to partisan campaigns in other states, we suspect any such attempt would offend the principle of interstate comity as well as the constitutional doctrine prohibiting overbreadth.

Therefore, to the extent that PEOPLE funds are used to support candidates in non-local elections, the constitutionality of the Little Hatch Act becomes an issue.

## C

### *The State of the Record and the Need for Remand*

Unfortunately for all concerned, the issues we have identified in Part II(A) and (B) are not ripe for our decision due to the state of the record.

The city alleged in its complaint that PEOPLE funds were used to support " * * * individual, partisan political candidates." AFSCME admitted this allegation. Beyond this point, the parties disagree. The city vigorously contends that PEOPLE funds are used to support partisan candidates for office within Ohio. AFSCME contends with equal vigor that some PEOPLE

funds are used to support candidates in federal and out-of-state elections, while other funds are spent on lobbying and nonpartisan political activities.

The validity of the PEOPLE checkoff provision hinges on the way in which PEOPLE uses its funds, but we cannot resolve this critical question on the record as it now stands. Though this case has been in litigation for nearly eight years, neither party has presented any admissible evidence which establishes how PEOPLE funds collected from Cincinnati employees are spent.

The only attempt at building a record occurred in 1986, after the case was reversed and remanded by the court of appeals due to the absence of the arbitrator's report from the record. AFSCME moved to correct the record by reinserting the report omitted by clerical error from the record on appeal, and to reinstate the prior summary judgment in its favor. The city filed a memorandum opposing AFSCME's motion, and attached several documents purporting to be PEOPLE's political action committee finance reports. In its reply memorandum, AFSCME disputed the relevance of these documents, contending that they pertain to a different political action fund than that at issue here, but did not produce any countervailing affidavits or other evidence.

This material cannot be considered as record evidence for two reasons. First, the documents were not certified copies, nor were they accompanied by an affidavit attesting to their authenticity; thus, they could not properly be considered under Civ.R. 56(E). *Nolla Morell v. Riefkohl* (D.P.R.1986), 651 F.Supp. 134. Second, and more important, to the extent that the city's memorandum attempted to oppose AFSCME's motion for summary judgment, which was made *before* the court of appeals remanded the case, it was filed out of rule. Even if the documents had been properly admissible, they could not have been considered by the trial court absent a showing of excusable neglect which would have justified an extension of time to respond to AFSCME's motion for summary judgment. See Civ.R. 6(B)(2); *Miller v. Lint* (1980), 62 Ohio St.2d 209, 16 O.O.3d 244, 404 N.E.2d 752; *Farmers & Merchants State & Savings Bank v. Raymond G. Barr Ent., Inc.* (1982), 6 Ohio App.3d 43, 6 OBR 153, 452 N.E.2d 521.[6]

The case is further complicated by the fact that the parties have entered into at least three successor collective bargaining agreements. While it has been stipulated that the PEOPLE checkoff provision is a part of these later agreements, there is no evidence in the record from which we can determine if the legality provision (or language of similar effect) is also a part of these agreements. Thus, we cannot determine if the PEOPLE checkoff provision in

---

**6.** The city also made no attempt to vacate the judgment under Civ.R. 60(B).

the later agreements prevails over the Little Hatch Act by operation of R.C. 4117.10(A), or is subordinated to the Little Hatch Act's requirements by other language in the agreement.

Until the factual record is developed, it is impossible to determine if the PEOPLE checkoff provision is valid in whole or in part for the term of any particular collective bargaining agreement. Therefore, we find it necessary to remand the case for further proceedings. On remand, we direct that the trial court consider the following issues:

(1) With regard to the period covered by the 1981 collective bargaining agreement, the court should determine how PEOPLE funds were used during that period. If any PEOPLE funds collected from Cincinnati employees were used for contributions to non-local candidates, the court should consider if the Little Hatch Act is unconstitutionally overbroad if applied to prohibit this conduct.[7]

(2) Regarding subsequent collective bargaining agreements, the court should first determine if those agreements also contain a legality provision. If any of them do not, then the PEOPLE checkoff provision prevails over the charter in accord with Part I of this opinion. If they do contain a legality provision, then the court should proceed with the same analysis as for the 1981 agreement.

## III

### Conclusion

The judgment of the court of appeals is reversed, and the cause is remanded to the Court of Common Pleas for Hamilton County for further proceedings consistent with our opinion.

*Judgment reversed*
*and cause remanded.*

---

7. We recognize that the overbreadth issue presents a question of law rather than one of fact. However, until the record is developed further in the trial court, the question is not ripe for determination.

Courts should not decide constitutional issues if the case can be decided without reaching them. *Kinsey v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund of Ohio* (1990), 49 Ohio St.3d 224, 225, 551 N.E.2d 989, 991. Until it is established that PEOPLE funds collected from Cincinnati were contributed to a candidate or political party involved in a non-local election, we cannot be certain that it is necessary to reach the overbreadth issue. Any pronouncement we might make now would be purely advisory, " * * * and it is well-settled that this court does not indulge itself in advisory opinions." *Armco, Inc. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 401, 406, 23 O.O.3d 361, 365, 433 N.E.2d 923, 926.

MOYER, C.J., concurs.

SWEENEY and DOUGLAS, JJ., concur in part and dissent in part.

RESNICK, J., concurs in the syllabus, but would reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

HOLMES, J., concurs in part and dissents in part.

WRIGHT, J., concurs in the judgment and in the separate opinion of HOLMES, J., except for Part IIB thereof.

HOLMES, J., separately concurring in part and dissenting in part. I strongly dissent from Part I of the majority opinion which permits Section 34, Article II of the Ohio Constitution, which authorizes the passage of laws dealing with wages and hours and laws " * * * providing for the comfort, health, safety and general welfare of all employees * * *," to override *all* other provisions of the Ohio Constitution. As the minority of this court feared in *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 20–44, 539 N.E.2d 103, 120–138, the current majority of this court is now set on a course to eliminate home-rule provisions from the Ohio Constitution whenever R.C. Chapter 4117 or a collective bargaining agreement arguably conflicts with such provisions. The result here is that a chartered municipality can do by contract what it cannot do by ordinance. I also dissent from the reasoning in Part II of the majority opinion due to the majority's interpretation of Section 4, Article V of the city's charter, although I reluctantly concur in the ultimate disposition of the case.

I

Initially, I would note that the majority's treatment of the so-called "permissive" subjects for collective bargaining is purely an advisory opinion given this court's decision, in Part II of this case, that no conflict exists between the parties' agreement and the city's charter. *Armco, Inc. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 401, 406, 23 O.O.3d 361, 365, 433 N.E.2d 923, 926; *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 694, 576 N.E.2d 765, 773–774 (H. Brown, J., concurring). In this case the court is confronted with a checkoff provision contained in a collective bargaining agreement between the city and AFSCME which clearly conflicts with Section 4, Article V of the city charter. In essence, the employees' union's political action committee contributes to partisan candidates for political office in direct contravention of the charter's prohibition of such contributions.

Section 3, Article XVIII of the Ohio Constitution provides that "[m]unicipalities shall have authority to exercise all powers of local self-government and to

adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." The statutes addressing public employees' collective bargaining, R.C. 4117.01 *et seq.*, have been found to be laws of a general nature. *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44, v. State Emp. Relations Bd.* (1986), 22 Ohio St.3d 1, 22 OBR 1, 488 N.E.2d 181. Under the majority's analysis, the municipal charter prevails unless it is in *conflict* with a general statutory provision. Under R.C. Chapter 4117, only existing contractual provisions and matters relating to "wages, hours, or terms and other conditions of employment" are subjects of mandatory bargaining. R.C. 4117.08. There are *no* provisions of R.C. Chapter 4117 that give public employees or employers the right to collectively bargain for checkoff deductions for contributions to partisan political activities; therefore, such checkoff deductions are not mandatory subjects of bargaining as contemplated under the statute. The majority of this court in *Rocky River, supra,* decided that a city's charter may not be interposed against the general law to "impair, limit or negate the [Ohio Public Employees' Collective Bargaining] Act." *Id.* at paragraph two of the syllabus.[8]

Clearly, checkoff deductions for contributions to a political fund are not matters pertaining to wages, hours, or terms and other conditions of employment. See R.C. 4117.08(A). Therefore, there is no statutory authority for their inclusion (or protection) in a collective bargaining agreement, and public employees have no right to bargain collectively with their employers on this matter. Consequently, a provision in a collective bargaining agreement concerning checkoff deductions for contributions to political funds does not invalidate a charter prohibition against such contributions, since the charter (or home-rule) provision does not "impair, limit or negate" the rights enumerated in R.C. 4117.01 *et seq.*

The majority's classification of so-called "permissive" bargaining subjects does further violence to Section 3, Article XVIII of the Ohio Constitution, in that it allows a union or public employer to eradicate *any* provision in a charter as long as the subject has not been deemed illegal pursuant to R.C. Chapter 4117. Thus, under the majority's opinion, parties to a collective bargaining agreement may invalidate home-rule provisions not even contem-

---

8. I still adhere to the applicability of the home-rule provisions as balanced against R.C. Chapter 4117 as set forth in Chief Justice Moyer's original *Rocky River* opinion. See *Rocky River v. State Emp. Relations Bd.* (1988), 39 Ohio St.3d 196, 530 N.E.2d 1; *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 21–22, 539 N.E.2d 103, 120–121 (Holmes, J., dissenting). However, for the sake of argument, I will apply the current majority's position on Section 34, Article II of the Ohio Constitution and home-rule in my analysis.

plated by the General Assembly (assuming the General Assembly ever intended to raise R.C. Chapter 4117 above any conflicting statutory, home-rule, or constitutional provision). The majority states that as "the inclusion of permissive subjects in a collective bargaining agreement was clearly foreseen * * *, it would violate legislative intent to construe the statute differently." Where does the majority get its evidence of legislative intent which is totally absent from the Act? Notwithstanding the majority's assertions to the contrary, in one broad stroke the majority has circumvented the Ohio Constitution without any justification. Justice Wilkin recognized in 1913 the effect of such a holding:

"If all powers of municipal self-government must be subject to general laws, then clearly cities do not have home rule; they have only such powers of local self-government as the Legislature of the state allows to them, and cities of Ohio will still remain under the domination of the state Legislature. * * * *" *Fitzgerald v. Cleveland* (1913), 88 Ohio St. 338, 380, 103 N.E. 512, 523 (Wilkin, J., concurring); see, also, *Rocky River, supra*, 43 Ohio St.3d at 42, 539 N.E.2d at 137 (Wright, J., dissenting).

I would add to the view expressed above that under the majority's analysis cities have only such powers of local government as the legislature of the state and any *collective bargaining agreement* allow to them.

## II

In the majority's haste to destroy valid home-rule provisions drafted pursuant to Section 3, Article XVIII of the Ohio Constitution, it has failed to properly apply the express language of the collective bargaining agreement and the city's charter in this case. Specifically, in Article XLVI, titled "Legality," the parties agreed:

"It is the intent of the City and the Union that this agreement comply, *in every respect*, with applicable legal statutes, *charter requirements*, governmental regulations which have the effect of law, and judicial opinions. If it is determined by a proper legal authority that any provision of this Agreement is in conflict with law, that provision shall be null and void and shall not affect the validity of the remaining paragraphs of this Agreement. In the event of an unlawful determination, that provision shall be reopened, and the City and the Union shall meet within (14) calendar days for the purpose of negotiating a lawful alternative provision." (Emphasis added.)

Even assuming *arguendo* that a permissive subject contained in a collective bargaining agreement would prevail over a charter provision, the "legality" provision within this agreement has the effect of *nullifying* those sections of the agreement which conflict with the charter provision. The parties obvious-

ly wanted to give effect to the charter if a conflict arose. Thus, by the majority's own analysis, the charter would prohibit checkoff deductions, since the parties independently agreed to be bound by a conflicting charter provision, even if such provision would not have nullified the checkoff section absent the "legality" section of their agreement. By applying R.C. Chapter 4117 to give effect to both of the permissive sections within the agreement, the checkoff provision necessarily fails due to its incongruity with the charter provision as required by the "legality" section. It would not make sense to apply the checkoff section to the exclusion of the "legality" section's requirement to abide by all charter provisions, since there would never be an instance where the charter provision would control[9] given a conflict with a section contained in a collective bargaining agreement.

Although the majority gives effect to the "legality" section it totally misconstrues the city's charter, which specifically requires in Section 4, Article V that:

"No person in the administrative service shall *directly* or *indirectly* give, solicit or receive, or in any manner be concerned in giving, soliciting or receiving any assessment, subscription or contribution for any *political party* or *for any candidate.* * * * " (Emphasis added.)

The city in its complaint for declaratory judgment stated that:

"10. The PEOPLE fund is and has been used to support individual, partisan political candidates.

"11. A controversy has arisen between plaintiff and defendant concerning whether Article XLI of the labor management agreements violates the provisions of Article V, Section 4 of the City's Charter. The City contends that if it continues to check off deductions to the PEOPLE fund as provided in Article XLI of the Agreement, it is performing an illegal act under Article V, Section 4 of the City's Charter."

Thus, the city challenged the propriety of direct contributions to PEOPLE itself and the indirect contribution by PEOPLE to support individual, partisan political candidates.

## A

As the majority recognizes, PEOPLE funds are used to support partisan candidates. Therefore, the checkoff provision for PEOPLE candidates vio-

---

9. Arguably, the only instance where a charter provision would control is when the parties have agreed to certain provisions which, by R.C. Chapter 4117, cannot be included in a collective bargaining agreement. See, *e.g.,* R.C. 4117.09(C) (required membership in an employee organization is illegal).

lates the charter's prohibition against *any* contributions to candidates. The majority remands to the trial court to determine whether any contributions were to non-local candidates. But it is of no consequence that there is proof lacking in the record as to whether these contributions go to local, state, or federal candidates in Ohio, since the charter's prohibition encompasses contributions to *all* candidates wherever they are located.

AFSCME misconstrues the import of federal election laws and their interpretations in its defense of the checkoff deductions. The pertinent portion of the Federal Election Campaign Act provides:

"The provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." Section 453, Title 2, U.S.Code.[10]

The Supreme Court of Missouri reviewed the above provision in light of a similar challenge to the one at bar and held:

"Even if a reader of the bare language might have some question as to the scope of the express preemption, the legislative history shows clearly that Congress did *not* intend the preemption language of § 453 to annul state little Hatch Acts, and other state laws * * *. The overwhelming concern was revision of the Federal Election Campaign Act of 1971. The legislative history makes it clear that 2 U.S.C. § 453 was intended only to preempt the limited field of statutes imposing restrictions on candidates for federal office and their campaign committees. The Conference Committee explained that purpose of § 453, as follows:

" 'It is clear that the Federal Law occupies the field with respect to reporting and disclosure of political contributions to and expenditures by Federal candidates and political committees, *but does not affect State laws as to the manner of qualifying as a candidate, or the dates and places of elections.'* S.Conf.Rep. No. 1237, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5587, 5618, 5668 (emphasis added)." (Emphasis sic.) *Pollard v. Bd. of Police Commrs.* (Mo.1984), 665 S.W.2d 333, 337, certiorari denied (1985), 473 U.S. 907, 105 S.Ct. 3534, 87 L.Ed.2d 657.

---

10. Section 453, Title 2, U.S.Code assumed its present form in 1974, as part of a bill amending the 1971 Federal Election Campaign Act, Pub.L. No. 92–225, 86 Stat. 3 (codified at Sections 431 to 455, Title 2, U.S.Code). The purpose of the 1974 federal statute was expressed as follows:

"To impose overall limitations on campaign expenditures and political contributions; to provide that each candidate for Federal office shall designate a principal campaign committee; to provide for a single reporting responsibility with respect to receipts and expenditures by certain political committees; to change the times for the filing of reports regarding campaign expenditures and political contributions; to provide for public financing of Presidential nominating conventions and Presidential primary elections; and for other purposes." Pub.L. No. 93–443, 88 Stat. 1263 (codified as amended at Sections 431 to 455, Title 2, U.S.Code).

The same conference committee referred to in the above quoted section also noted that the inclusion of an amendment to part of the federal Hatch Act, Section 1502, Title 5, U.S.Code, in the 1974 amendatory act was not an expression of a desire to preempt state laws in that field of concern. *Id.* Specifically, the committee report provided:

"It is the intent of the conferees that any State law regulating the political activities of State and local officers and employees is not preempted or superseded by the amendments to title 5, United States Code made by this legislation." (Emphasis added.) S.Conf.Rep. No. 1237, U.S.Code Cong. & Adm.News (1974) 5587, 5618, at 5669.

In *Pollard, supra,* a police officer was terminated for having contributed $1,000 of his own funds to a political committee formed to promote the nomination of a Missouri congressional candidate in a party primary. The basis for the officer's termination was a Missouri Hatch Act, similar to the one in the present case, which provided in pertinent part:

" '1. * * * No officer or employee in the service of said police department shall directly or indirectly give, pay, lend, or contribute any part of his salary or compensation or any money or other valuable thing to any person on account of, or to be applied to, the promotion of any political party, political club, or any political purpose whatever.' " *Pollard, supra,* at 335.

In upholding this statutory provision the *Pollard* court decided that the state's prohibition of contributions was not preempted. Rather, the Congressional legislative history "reveal[ed] a manifest Congressional purpose of not preempting state laws regulating the political activities of state or local public employees, *whether or not related to federal elections.* The amendatory act of 1974 preempts the field only with respect to candidates and their campaign committees." (Emphasis added.) *Id.* at 338; accord *Reeder v. Kansas City Bd. of Police Commrs.* (C.A.8, 1984), 733 F.2d 543, 544–546. The United States Court of Appeals, Eighth Circuit, explicitly approved of *Pollard* 's analysis and stated further that the drafters of the Federal Election Campaign Act " * * * intended * * * to leave the States free, so far as any claim of preemption was concerned, to allow or forbid political activities, including contributions, by their own employees." *Reeder, supra,* at 546.

In AFSCME's fifth affirmative defense to the city's complaint for declaratory judgment it alleged that prohibitions against contributions to a political action committee violate the First Amendment to the United States Constitution. I disagree.

Citizens who become public employees receive certain benefits and undertake certain responsibilities. One of the duties involved with public employment may be to surrender certain rights that would otherwise be beyond the

jurisdiction of governmental control. Clearly, restrictions imposed in cases such as this abridge freedom of speech. But the United States Supreme Court has often held that First Amendment rights, although vital to our constitutional existence, are not absolute. The government's interest in regulating both conduct and speech of its employees differs significantly from its interest in regulating these same activities of its citizenry in general. See *Pickering v. Bd. of Edn.* (1968), 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811; *United States Civ. Serv. Comm. v. Natl. Assn. of Letter Carriers* (1973), 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796, 808; see, also, *United Pub. Workers of America v. Mitchell* (1947), 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754. Thus, federal, state and local governments have the power to place restrictions on the political conduct of their employees when "such restrictions serve valid and important state interests." *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 606, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830, 836. "The goal is to balance the interest of the employee as a citizen, in exercising first amendment rights, and the interest of the government, as an employer; in promoting the efficiency and impartiality of public services." *Pollard, supra,* at 339; see, also, *Reeder, supra,* at 546–548; *Stowe v. Ryan* (1931), 135 Ore. 371, 296 P. 857 (A civil service regulation which provided that no member of the civil service could engage in any political activity whatever was held not to unduly infringe on civil service employees' freedom of speech because such restrictions were valid conditions of employment. The court explained that there is no right to a civil service position and individuals may relinquish some of their rights as a condition precedent of taking a position); *State v. Stuler* (Fla.1960), 122 So.2d 1 (A state statute making it unlawful for any officer or employee of the state, a county, or a municipality to directly or indirectly coerce or attempt to coerce, command, or advise any other officer or employee to pay, lend, or contribute anything of value to any party, committee, organization, agency, or persons for political purposes was not an unlawful abridgment of the right to free speech). I conclude in light of the authority cited herein that the city charter did not infringe on the public employees' rights.

AFSCME also claimed in its fourth affirmative defense that the charter prohibition against contributions was unconstitutionally overbroad. I disagree. Clearly, a contribution to a congressional candidate well might benefit local politicians who have joined in a common cause with that candidate. Obviously, the dangers posed by direct contributions to candidates for mayor and governor are more visible, since the mayor is a member of local government directly affecting public employees and the governor is, in part, responsible for legislation which affects municipalities. However, the difference between these kinds of contributions and those which affect elections that are

not for local office is not sufficiently pronounced to require a holding that the latter may not be prohibited, even if the former may. Thus, I find it reasonable for the drafters of the city charter to have assumed that any contributions to political candidates by public employees would either directly or indirectly put into question the integrity of the offices the employees hold. See *Wachsman v. Dallas* (C.A.5, 1983), 704 F.2d 160, certiorari denied (1983), 464 U.S. 1012, 104 S.Ct. 537, 78 L.Ed.2d 717 (Dallas city charter provision prohibiting city employees from soliciting contributions for any electoral campaign was held not to be overly broad in its application to all types of elections. The court reasoned that it was unrealistic to assume that politics within the geographical boundaries of a city were divided into completely unrelated compartments); *Pollard, supra; Reeder, supra.* Consequently, in light of AFSCME's admission that PEOPLE uses its payroll deductions to make contributions to candidates for federal office and also to candidates for state and local office outside Ohio, the requirement for checkoff deductions in the parties' agreement must necessarily be stricken as violating Section 4, Article V of the city's charter.

## B

I further disagree with the majority's unwillingness to recognize that contributions to PEOPLE are directly prohibited by virtue of PEOPLE's status as a party itself. As noted earlier, the charter states that "No person in the administrative service shall directly or indirectly give, solicit or receive, or in any manner be concerned in giving, soliciting or receiving any assessment, subscription or contribution for any *political party* * * *." (Emphasis added.) The majority states that the city conceded long ago that if checkoff deduction funds were used for political purposes other than contributions to parties or candidates they would not violate the charter's prohibition against contributions to political parties. The finding is understandable given the history of this case; however, it is nonetheless erroneous under the record. Specifically, the city in a letter to AFSCME conceded only that it was not objecting to monies used for lobbying. Further, the letter was a product of AFSCME's original grievance against the city and was not incorporated into this separate action. Rather, the city in this case stated in its memorandum in opposition to defendants' motion to dismiss and motion for summary judgment that "[c]learly, the payroll deduction for political purposes is in direct conflict with the provisions of the City charter." Therefore, the city preserved its right to challenge the propriety of PEOPLE deductions notwithstanding whether the contributions went to partisan political candidates.

In reaching the merits of this issue I would find that any contributions which directly or indirectly go to a political party violate Section 4, Article V of the city's charter. Clearly, PEOPLE itself is a "political party" as that term is defined in Black's Law Dictionary (6 Ed.) 1158:

"Political Party. An association of individuals whose primary purposes are to promote or accomplish elections or appointments to public offices, positions, or jobs. *State, ex rel. Corrigan, v. Cleveland–Cliffs Iron Co.*, 169 Ohio St. 42 [8 O.O.2d 7], 157 N.E.2d 331, 333. A committee, association, or organization which accepts contributions or makes expenditures for the purpose of influencing or attempting to influence the election of presidential or vice presidential electors or of any individual whose name is presented for election to any federal, state, or local elective public office, whether or not such individual is elected. Cal.Rev. & Tax Code § 24434(b)(1)(C)."

AFSCME admits in its brief to this court that "PEOPLE is funded by voluntary contributions from AFSCME members, most of which are made by payroll deduction. It makes contributions primarily to candidates for federal office, and also to candidates for state and local office in those states (not including Ohio) where union treasury funds cannot be used to make contributions." Thus, PEOPLE is a political party and any contributions to the organization would violate the city charter. Accordingly, since PEOPLE gives to political candidates and is itself a political party a remand for such determinations is only a waste of judicial economy.

C

Therefore, for the reasons expressed in Part I of this dissent I would recognize that the city's charter provision prevails over the agreement and for the reasons espoused in Part II, I reluctantly join with the majority in remanding this case for the limited purpose of determining the extent of PEOPLE contributions to political candidates generally.

DOUGLAS, J., concurring in part and dissenting in part. I concur in the syllabus law and the analysis of the legal issues contained in Part I of the majority opinion. However, I disagree that the "legality" provision of the 1981–1983 collective bargaining agreement (even if part of any successor agreement) affects the validity of the "PEOPLE checkoff provision." Therefore, I must respectfully dissent from the balance of the majority's opinion— including the majority's ultimate judgment.

I begin by noting that today's majority opinion represents one of the greatest threats to the well-being of Ohio's Public Employees' Collective Bargaining Act (R.C. Chapter 4117) since this court's decision in *Rocky River v. State Emp. Relations Bd.* (1988), 39 Ohio St.3d 196, 530 N.E.2d 1 ("Rocky

I"), vacated on reconsideration (1989), 43 Ohio St.3d 1, 539 N.E.2d 103 ("Rocky IV"). The majority holds that a "legality" provision, such as the one contained in Article XLVI of the 1981–1983 collective bargaining agreement, invalidates a lawful provision of a collective bargaining agreement if the lawful provision conflicts with a city charter. In my judgment, this holding creates a crack in the foundation of public sector labor relations by essentially nullifying (in large part) the effect of R.C. 4117.10(A).

Article XLVI of the parties' 1981–1983 collective bargaining agreement provided as follows:

"A. *It is the intent of the City and the Union that this Agreement comply,* in every respect, *with applicable* legal statutes, *charter requirements,* governmental regulations which have the effect of law, and judicial opinions. *If it is determined by a proper legal authority that any provision of this Agreement is in conflict with law, that provision shall be null and void and shall not affect the validity of the remaining paragraphs of this Agreement.* In the event of an unlawful determination [*sic*], that provision shall be reopened, and the City and the Union shall meet within fourteen (14) calendar days for the purpose of negotiating a lawful alternative provision." (Emphasis added.)

"Legality" provisions are contained in collective bargaining agreements to provide a means of "reopening" discussions on matters which were agreed upon, but which violate the law. In the case at bar, the "PEOPLE checkoff provision" does not violate the law because R.C. 4117.08 does not prohibit bargaining over such matters. Thus, the "PEOPLE checkoff provision" is not "in conflict with law" within the meaning of Article XLVI of the contract. As such, R.C. 4117.10(A) and a long line of cases decided by this court mandate that the terms of the collective bargaining agreement prevail over the city's charter. See, *e.g., DeVennish v. Columbus* (1991), 57 Ohio St.3d 163, 566 N.E.2d 668. See, also, *Rocky IV, supra.*

Additionally, I fear that today's majority unwittingly sets sail on a long and dangerous course when it construes "legality" provisions so as to invalidate the lawful provisions of a collective bargaining agreement simply because the parties to the agreement express an intention that the agreement comply with the law. It is my belief that the majority's voyage will be plagued by the realization that invalidating the lawful provisions of an agreement on this basis will promote turmoil between many public employers and their employees, and create instability in existing labor relationships for years to come.

Article XLVI is similar to many "legality" provisions contained in existing collective bargaining agreements throughout this state. Until those agreements expire, today's majority has granted public employers the right to

ignore certain terms of their agreements and to substitute therefor terms and conditions of employment which are addressed by, *inter alia,* a city charter. I believe that today's majority opinion will be cited by public employers throughout this state in an attempt to achieve that which could not be obtained by the employer during collective bargaining negotiations. It is my judgment that "legality" provisions are not intended to give either party to a collective bargaining agreement a second "bite at the apple."

Accordingly, I would reverse the judgment of the court of appeals since the "PEOPLE checkoff provision" prevails over the city charter by operation of R.C. 4117.10(A). In my judgment, the "legality" provision does not change this result and, hence, no remand is necessary. Indeed, remanding this case for the reasons stated in the majority opinion may result in the invalidation of the "PEOPLE checkoff provision." Thus, remanding this cause is tantamount to affirming the judgment of the court of appeals.

As a final matter, it should be noted that the majority opinion gratuitously addresses certain issues concerning the First Amendment to the United States Constitution which, by the majority's own admission, are not ripe for determination in this court, and includes the statement that " * * * it is unquestionable that the city may limit its employees' participation in local partisan politics without violating the Constitution." Whether I agree or disagree with some or all of the commentary is not pertinent because any pronouncement on such matters is advisory, and it is well established that this court will not indulge itself in advisory opinions. See, *e.g., Morris v. Savoy* (1991), 61 Ohio St.3d 684, 576 N.E.2d 765, 773–774 (H. Brown, J., concurring).

SWEENEY, J., concurs in the foregoing opinion.