OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


Painter, Appellant, v. Graley, Appellee.
[Cite as Painter v. Graley (1994),      Ohio St. 3d    .]
Employer and employee -- Ohio Constitution does not guarantee
     an unclassified public employee a right to seek partisan
     elected office while holding public employment --
     Requirements for stating a claim of wrongful discharge in
     violation of public policy -- Sources from which "clear
     public policy" sufficient to justify an exception to the
     employment-at-will doctrine may be discerned.
1.   Neither Section 2, Article I nor Section 11, Article I of
          the Ohio Constitution guarantees an
          unclassified public employee a right to seek
          partisan elected office while holding public
          employment.
2.   To state a claim of wrongful discharge in violation of
          public policy, a plaintiff must allege
          facts demonstrating that the employer's act
          of discharging him contravened a "clear
          public policy."  (Greeley v. Miami Valley
          Maintenance Contractors, Inc. [1990], 49
          Ohio St.3d 228, 551 N.E.2d 981, affirmed
          and followed.)
3.   "Clear public policy" sufficient to justify an exception to
          the employment-at-will doctrine is not
          limited to public policy expressed by the
          General Assembly in the form of statutory
          enactments, but may also be discerned as a
          matter of law based on other sources, such
          as the Constitutions of Ohio and the United
          States, administrative rules and
          regulations, and the common law.  (Tulloh
          v. Goodyear Atomic Corp. [1992], 62 Ohio
          St. 3d 541, 548 N.E.2d 729, overruled.)
     (No. 93-325 -- Submitted March 30, 1994 -- Decided
September 28, 1994.)
     Appeal from the Court of Appeals for Cuyahoga County, No.
61148.
     In October 1984, appellant Shirley Painter was appointed

to the position of Chief Deputy Clerk in the Bookkeeping Department of the Civil Division of the Municipal Court of the city of Cleveland.  The parties agree that Painter was an unclassified civil servant.  Her duties in that position were primarily clerical in nature, and did not involve policymaking.

In 1985, appellant became a candidate for the office of member of Cleveland City Council.  Appellant ran as a Democrat.  On August 21, 1985, she requested a leave of absence of undetermined duration from her chief deputy clerk duties.  Her asserted reason for seeking a leave of absence was to "seek political office in the city of Cleveland."

During 1985, appellee Charles L. Graley held the position of assistant personnel director in the municipal court clerk's office.  On October 30, 1985, Graley notified appellant that her employment as chief deputy clerk had been terminated effective October 1, 1985.

In October 1988, Painter filed an action in the Cuyahoga County Court of Common Pleas in which she demanded reinstatement to her chief deputy clerk position in the municipal court, an award of back pay from the date of her termination, punitive damages, and attorney fees.  The court of common pleas granted summary judgment in Painter's favor, finding she was entitled to relief based on precedent established in Mancuso v. Taft (C.A.1, 1973), 476 F. 2d 187; Vincent v. Maeras (S.D. Ill. 1978) 447 F. Supp. 775; and Johnson v. Cushing (D. Minn. 1980), 483 F.Supp. 608.  The court held a hearing at which it received evidence relevant to the amount of damages suffered by Painter.  The court ultimately awarded judgment to Painter and ordered that she be reinstated to the post of chief deputy clerk.  Painter was also awarded damages representing back pay.

The Eighth District Court of Appeals reversed, and entered judgment in favor of defendant-appellee Graley. The appellate court found that Painter had not established a violation of her rights under the Ohio Constitution nor had she established a right to recover damages pursuant to Greeley v. Miami Valley Maintenance Contractors, Inc. (1990), 49 Ohio St.3d 228, 551 N.E.2d 981.  Painter v. Graley (1992), 84 Ohio App.3d 65, 616 N.E.2d 285.

The cause is now before this court pursuant to the allowance, upon rehearing, of a motion to certify the record.

Joseph R. Compoli, Jr. and James R. Goodluck, for appellant.

Sharon Sobol Jordan, Cleveland Director of Law, and Barbara R. Marburger, Assistant Director of Law, for appellee.

Kevin F. O'Neill, urging reversal for amicus curiae, American Civil Liberties Union of Ohio Foundation, Inc.[1]

A. William Sweeney, J.     The court of appeals held that appellant did not suffer a violation of her rights under the Ohio Constitution, and was not entitled to relief under the doctrine of wrongful discharge in violation of public policy as established in Greeley v. Miami Valley Maintenance Contractors, Inc. (1990), 49 Ohio St.3d 228, 551 N.E.2d 981.  We agree with the majority opinion of the court of appeals, per Presiding Judge (now Justice) F.E. Sweeney, that Painter did not suffer a

violation of rights guaranteed by the Ohio Constitution, and we affirm its holding that defendant-appellee Graley was entitled to judgment in his favor.

## Asserted Violation of Rights
## Protected by the Ohio Constitution

Appellant urges us to hold that Sections 2 and 11,2 Article I of the Ohio Constitution grant her a right to become a candidate for public office, and asks us to specifically recognize the existence of a private cause of action to obtain a remedy for the violation of that right. She argues that a public employer may not, consistent with the Ohio Constitution, discharge an unclassified public employee based solely on the reason that the employee became a candidate for public office.3

We held in Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities (1992), 64 Ohio St. 3d 252, 594 N.E.2d 959, that "[p]ublic employees do not have a private cause of civil action against their employer to redress alleged violations by their employer of policies embodied in the Ohio Constitution when it is determined that there are other reasonably satisfactory remedies provided by statutory enactment and administrative process." Id. at syllabus. Provens did not determine whether a private, common-law cause of action might be available to unclassified public employees or others asserting violations of constitutional rights for which statutory or administrative remedies do not exist.

Painter has expressly disclaimed any reliance on rights or protections provided by the Constitution of the United States, and has instead confined her arguments to rights arising from the Ohio Constitution. The trial court granted Painter summary judgment based on the federal cases of Mancuso v. Taft (C.A.1, 1973), 476 F. 2d 187; Vincent v. Maeras (S.D. Ill. 1978), 447 F. Supp. 775; and Johnson v. Cushing (D. Minn. 1980), 483 F.Supp. 608. Because those cases concerned federal substantive law, we find them to be of limited value in our interpretation of the Ohio Constitution, as "[t]he Ohio Constitution is a document of independent force." Arnold v. Cleveland (1993), 67 Ohio St. 3d 35, 616 N.E.2d 163, at syllabus. We note, however, that subsequent to the decisions of the Supreme Court of the United States in United States Civ. Serv. Comm. v. Natl. Assn. of Letter Carriers, AFL-CIO (1973), 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796, and Broadrick v. Oklahoma (1973), 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830, the very court which decided Mancuso questioned its continued vitality. Magill v. Lynch (C.A.1, 1977), 560 F.2d 22, 27. Similarly, Johnson v. Cushing supra, was later described as containing "undeniably an incorrect interpretation of the Hatch Act [Sections 1501 through 1508, Title 5, U.S. Code]. *** [I]t is clear from the statute and the legislative history that a covered state employee is prohibited from running for public office in a partisan election, even if on approved leave without pay." Minnesota Dept. of Jobs & Training v. Merit Sys. Protection Bd. (C.A.8, 1989), 875 F.2d 179, 183. See, also, Waters v. Churchill (1994), 511 U.S.   ,   ,    S.Ct.   ,   , L.Ed.2d   ,   , U.S.   ,   , ("Even something as close to the core of the First Amendment as participation in political campaigns may be prohibited to government employees. Broadrick v. Oklahoma, [supra]; Letter Carriers, supra; Public Workers v.

Mitchell, 330 U.S. 75 [67 S.Ct. 556, 91 L.Ed. 754] [1947].").

This court has consistently held that rational restrictions on a public employee's right to run for office may be imposed without violating rights arising from the Ohio Constitution. See State ex rel. Keefe v. Eyrich (1986), 22 Ohio St.3d 164, 22 OBR 252, 489 N.E.2d 259 (restriction against becoming candidate for judge on the basis of age upheld); State ex rel. Vana v. Maple Hts. City Council (1990), 54 Ohio St. 3d 91, 561 N.E.2d 909 (city charter provision prohibiting an elected official from simultaneously holding other public office or other public employment upheld). See, also, Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty, & Mun. Emp., AFL-CIO (1991), 61 Ohio St.3d 658, 576 N.E.2d 745 ("[I]t is unquestionable that the city may limit its employees' participation in local partisan politics without violating the Constitution." Id., 61 Ohio St.3d at 670, 576 N.E.2d at 755.). Our holding today is consistent with the precedent established in these cases.

Although an unclassified employee is not prohibited by statute or Cleveland ordinance from seeking partisan elected office,4 that fact does not lead to the conclusion that a public employer may not himself prohibit his at-will employees from running for such an office. Stated differently, such an employer is not constitutionally required to accept his subordinate's decision to become a candidate for election to partisan elected office, and maintain the employment of that subordinate during his candidacy or term of office.

We hold today that neither Section 2, Article I nor Section 11, Article I of the Ohio Constitution guarantees an unclassified public employee a right to seek partisan elected office while holding public employment. Thus, Painter's dismissal from the employ of the municipal court did not violate her Ohio constitutional rights.

Claim Under Doctrine
of Wrongful Discharge in
Violation of Public Policy

Both the trial court and the court of appeals analyzed Painter's claim based on Greeley v. Miami Valley Maintenance Contractors, Inc. (1990), 49 Ohio St. 3d 228, 551 N.E. 2d 981, which created an exception to the common-law employment-at-will doctrine historically followed in Ohio. Traditionally, this doctrine allowed an employer to terminate the employment of his worker "'at will for any cause, at any time whatsoever, even if done in gross or reckless disregard of [an] employee's rights.'" Phung v. Waste Mgt., Inc. (1986), 23 Ohio St. 3d 100, 102, 23 OBR 260, 261-262, 491 N.E.2d 1114, 1116, quoting Peterson v. Scott Constr. Co. (1982), 5 Ohio App. 3d 203, 205, 5 OBR 466, 468, 451 N.E.2d 1236, 1239.

In Phung, an employee asserted that his employer discharged him for the reason that he had reported company violations of "legal and societal obligations" to his employer, and had demanded that the company cease the violations. This court refused to acknowledge the existence of a public policy exception to the employment-at-will doctrine under those facts, stating that Phung had "failed to state a violation of a sufficiently clear public policy to warrant creation of a cause of action" Id., 23 Ohio St. 3d at 102, 23 OBR at 262, 491 N.E.

2d at 1116-1117.

In dissent, Justice Clifford F. Brown, joined by Justice A.W. Sweeney, argued that Phung's allegations that his employer fired him as a direct consequence of his reporting legal improprieties described conduct in violation of clear public policy. Justice Brown maintained that "[t]his court, and the citizenry of Ohio, simply cannot tolerate an employer's retaliatory discharge of an employee under such circumstances." Id., 23 Ohio St.3d at 107, 23 OBR at 266, 491 N.E. 2d at 1120. Justice Brown argued that public policy sufficient to justify an exception to the employment-at-will doctrine could be found in well-established sources such as legislation; administrative rules, regulations or decisions; and judicial decisions. Id.

In Greeley v. Miami Valley Maintenance Contractors, Inc. supra, we expressly recognized a cause of action in tort for wrongful discharge in violation of public policy. Greeley, at paragraph three of the syllabus. We thus expressly acknowledged an exception to the traditional employment-at-will doctrine in Ohio common law. Pursuant to Greeley, a discharged employee has a private cause of action sounding in tort for wrongful discharge where his or her discharge is in contravention of a "sufficiently clear public policy." Id., 49 Ohio St.3d at 233, 551 N.E. 2d at 986 (citing Phung, supra). In Greeley, we recognized that public policy was "sufficiently clear" where the General Assembly had adopted a specific statute forbidding an employer from discharging or disciplining an employee on the basis of a particular circumstance or occurrence.5 We noted that other exceptions might be recognized where the public policy could be deemed to be "of equally serious import as the violation of a statute." Id., 49 Ohio St. 3d at 235, 551 N.E. 2d at 987.

Consistent with Greeley, we hold today that to state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employer's act of discharging him contravened a "clear public policy."

Subsequent to Greeley, the courts of appeals in this state have differed as to whether an employee has a cause of action for wrongful discharge in violation of public policy not stated in a statute.6 In recent years, those courts which refused to acknowledge the existence of such a claim have had good basis for doing so in the syllabus in Tulloh v. Goodyear Atomic Corp. (1992), 62 Ohio St. 3d 541, 548 N.E.2d 729, which reads: "[a]bsent statutory authority, there is no common-law basis in tort for a wrongful discharge claim." Id. at syllabus.7

Provisions found in the Ohio Constitution are necessarily statements of Ohio public policy, if not the most definitive statements of Ohio public policy. Strict and literal adherence to the syllabus of Tulloh would lead to the illogical result that courts could not recognize claims of wrongful discharge in violation of public policies where those policies arise from the Constitution of Ohio, unless that public policy was also incorporated into a legislative enactment.

The syllabus to Tulloh oversimplifies the public policy exception to Ohio's employment-at-will common-law doctrine, and is hereby overruled. "Clear public policy" sufficient to justify an exception to the employment-at-will doctrine is not

limited to public policy expressed by the General Assembly in the form of statutory enactments.  As this court recently noted, "[w]hen the common law has been out of step with the times, and the legislature, for whatever reason, has not acted, we have undertaken to change the law, and rightfully so.  After all, who presides over the common law but the courts?" Gallimore v. Children's Hosp. Med. Ctr. (1993), 67 Ohio St. 3d 244, 253, 617 N.E.2d 1052, 1059. Today we reaffirm Greeley and hold that an exception to the employment-at-will doctrine is justified where an employer has discharged his employee in contravention of a "sufficiently clear public policy."  The existence of such a public policy may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law.

We have confidence that the courts of this state are capable of determining as a matter of law whether alleged grounds for a discharge, if true, violate a "clear public policy" justifying an exception to the common-law employment-at-will doctrine, thereby stating a claim.  In making such determinations, courts should be mindful of our admonition in Greeley that an exception to the traditional doctrine of employment-at-will should be recognized only where the public policy alleged to have been violated is of equally serious import as the violation of a statute. Id., 49 Ohio St.3d at 234, 551 N.E. 2d at 987.

We note as well that a finding of a "sufficiently clear public policy" is only the first step in establishing a right to recover for the tort of wrongful discharge in violation of public policy.  In cases where this required element of the tort is met, a plaintiff's right of recovery will depend upon proof of other required elements.  Full development of the elements of the tort of wrongful discharge in violation of public policy in Ohio will result through litigation and resolution of future cases, as it is through this means that the common law develops.8

In light of the foregoing analysis, it is necessary for us to determine whether a "sufficiently clear public policy" exists which precluded Painter's firing from her unclassified position for the reason that she became a candidate for partisan elected office.  We note that the General Assembly has not remained silent on the respective rights of unclassified employees and their employers, but rather has enacted several statutes as legislative statements of public policy in this area.  Where the General Assembly has spoken, and in so speaking violated no constitutional provision, the courts of this state must not contravene the legislature's expression of public policy.  "Judicial policy preferences may not be used to override valid legislative enactments, for the General Assembly should be the final arbiter of public policy."  State v. Smorgala (1990), 50 Ohio St. 3d 222, 223, 553 N.E.2d 672, 674.

In adopting R.C. 1901.32, the General Assembly not only established Painter's office of Chief Deputy Clerk in the Cleveland Municipal Court as an unclassified position, but also specifically provided that "any appointee under sections 1901.01 to 1901.37 of the Revised Code may be dismissed or discharged by the same power which appointed him."  In

specifically designating chief deputy clerks to be unclassified, the legislature expressed the public policy that they serve at the pleasure of those who appointed them.  That is, Painter's at-will status as a public employee was prescribed by statute, and is not the result of the common-law employment-at-will doctrine.  In that Painter's dismissal did not violate her constitutional rights, the existence of this legislative directive precludes us from finding a "sufficiently clear public policy" against Painter's dismissal based upon her becoming a candidate for office.9

Because there is no clear public policy in support of allowing public employees to become candidates for partisan elective office, we affirm the court of appeals' finding that Painter's claim of wrongful discharge lacks merit.

For the foregoing reasons, the judgment of the court of appeals is affirmed.

Judgment affirmed.

Resnick, J., concurs.

Moyer, C.J., concurs in paragraphs one and two of the syllabus and in the judgment.

Wright, J., concurs in paragraph one of the syllabus and in the judgment

Douglas and Pfeifer, JJ., concur in part and dissent in part.

Brogan, J., dissents.

James A. Brogran, J., of the Second Appellate District, sitting for F.E. Sweeney, J.

FOOTNOTES:

1  Amicus's motion for leave to file its brief instanter is granted.

2  Section 2, Article I of the Ohio Constitution provides:

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly."

Section 11, Article I of the Ohio Constitution provides:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press.  In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted."

3  Throughout this litigation, Painter has consistently asserted that she was dismissed for the sole reason that she sought elected office.  Defendant Graley at no point has disputed this characterization of his motivation in dismissing Painter.  On this record, we accept Painter's assertion that the sole cause of her dismissal was her decision to become a candidate for the elected office of member of Cleveland City Council.

4  R.C. 124.57 provides:

"No officer or employee in the classified service of the

*** cities *** shall directly or indirectly, orally or by letter, solicit or receive, or be in any manner concerned in soliciting or receiving any assessment, subscription, or contribution for any political party or for any candidate for public office; nor shall any person solicit directly or indirectly, orally or by letter, or be in any manner concerned in soliciting any such assessment, contribution, or payment from any officer or employee in the classified service of the state and the several counties, cities,or city school districts thereof, or civil service townships; nor shall any officer or employee in the classified service of the state and *** cities *** be an officer in any political organization or take part in politics other than to vote as he pleases and to express freely his political opinions."  (Emphasis added.)

5  In Greeley, the plaintiff alleged that he had been fired as the result of a court order to his employer for wage assignment.  The order required the employer to withhold amounts representing court-ordered child support payments from plaintiff's pay.  Plaintiff claimed that his discharge violated R.C. 3113.213(D), which provides that "[n]o employer may use an order to withhold personal earnings [for satisfaction of child support orders] as a basis for a discharge of *** an employee."

6  See, e.g., Shaffer v. Frontrunner, Inc. (1990), 57 Ohio App.3d 18, 566 N.E.2d 193; Clipson v. Schlessman (1993), 89 Ohio App.3d 230, 624 N.E.2d 220; cf. Edelman v. Franklin Iron & Metal Corp. (1993), 87 Ohio App.3d 406, 622 N.E.2d 411; Sabo v. Schott (Mar. 2, 1994), Hamilton App. No. C-920941, unreported, 1994 WL 59464, discretionary appeal allowed in (1994), 70 Ohio St.3d 1435,    N.E.2d   ; Collins v. Rizkana (Nov. 22, 1993), Stark App. No. CA-9310, unreported, 1993 WL 500478, motion to certify the record allowed in (1994), 69 Ohio St.3d 1429, 631 N.E.2d 640; Ricciardi v. Babcock & Wilcox Co. (Jan. 27, 1993), Summit App. No. 15728, unreported, 1993 WL 20999, motion to certify the record allowed in (1993), 67 Ohio St.3d 1409, 615 N.E.2d 1044, appeal dismissed on joint application in (1994), 69 Ohio St.3d 1420, 631 N.E.2d 160; Eagleye v. TRW, Inc. (Feb. 17, 1994), Cuyahoga App. No. 64662, unreported.

7  The majority in Tulloh consisted of Chief Justice Moyer, Justice Wright, and two judges of courts of appeals sitting by appointment.  Joining in Justice Douglas's written dissent were Justices A.W. Sweeney and Resnick, current members of this court.

8  In reviewing future cases, Ohio courts may find useful the analysis of Villanova Law Professor H. Perritt, who, based on review of cases throughout the country, has described the elements of the tort as follows:

"1.  That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

"2.  That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

"3.  The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

"4.  The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)."  (Emphasis sic.)

H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399.

9   Our opinion herein should thus not necessarily be extended to nonpublic employees.  We express no opinion as to whether public policy would prohibit a private employer from discharging an employee based on that employee's becoming a candidate for public office.

Douglas, J., concurring in part and dissenting in part.     I concur with paragraphs two and three of the syllabus and the well-reasoned discussion supporting these statements of law.  I respectfully dissent as to paragraph one of the syllabus and the ultimate judgment reached by the majority.  In this regard, I concur in the persuasive excursus in the dissent of Judge Brogan.

Pfeifer, J., concurs in the foregoing opinion.

Brogan, J., dissenting.  I must respectfully dissent from the lead opinion.  I would reverse the court of appeals and find that Painter was wrongfully terminated for merely exercising her rights to freedom of speech as guaranteed by the Ohio Constitution, in Section 11, Article I.

Long ago, the United States Supreme Court held that Congress had the power to regulate within reasonable limits the political conduct of federal employees in order to promote efficiency and integrity in the public service.  Ex parte Curtis (1882), 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232.  In Curtis, the court held that the congressional Act of 1876 which forbade certain officers of the United States from requesting from, giving to or receiving from any other officer money or property for political purposes was constitutional.

In 1947, the United States Supreme Court in United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754, held that the provisions of the Hatch Act, which prohibited certain federal employees from taking an "active part in political management or in political campaigns," did not violate the fundamental rights of free speech guaranteed by the First Amendment.

The court held that it was sufficient under the Constitution that the act of the employee be reasonably deemed by Congress to interfere with the efficiency of public service.  The court noted that "[w]hatever differences there may be between administrative employees of the government and industrial workers in its employ are differences in detail" for sole consideration of Congress.  Id. at 102, 67 S.Ct. at 570, 91 L.Ed. at 774.

Justice Black dissented in Mitchell on the basis that the provision of the Hatch Act under attack was too broad, ambiguous, and uncertain in its consequences to be made the basis of removing deserving employees from their jobs.  He wrote the following, id. at 110-113, 67 S.Ct. at 575-576, 91 L.Ed. 778-780:

"The right[s] to vote and privately to express an opinion on political matters, important though they be, are but parts of the broad freedoms which our Constitution has provided as the bulwark of our free political institutions.  Popular government, to be effective, must permit and encourage much wider political activity by all the people.  Real popular

government means 'that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion ***.  Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth.' Thornhill v. Alabama [1940], 310 U.S. 88, 95 [60 S.Ct. 736, 741, 84 L.Ed. 1093, 1098]. Legislation which muzzles several million citizens threatens popular government, not only because it injures the individuals muzzled, but also because of its harmful effect on the body politic in depriving it of the political participation and interest of such a large segment of our citizens.  Forcing public employees to contribute money and influence can well be proscribed in the interest of 'clean politics' and public administration.  But I think the Constitution prohibits legislation which prevents millions of citizens from contributing their arguments, complaints, and suggestions to the political debates which are the essence of our democracy; prevents them from engaging in organizational activity to urge others to vote and take an interest in political affairs; bars them from performing the interested citizen's duty of insuring that his and his fellow citizens' votes are counted.  Such drastic limitations on the right of all the people to express political opinions and take political action would be inconsistent with the First Amendment's guaranty of freedom of speech, press, assembly, and petition.  And it would violate, or come dangerously close to violating Article I and the Seventeenth Amendment of the Constitution, which protect the right of the people to vote for their Congressmen and their United States Senators and to have their votes counted.  See Ex parte Yarbrough [1884], 110 U.S. 651 [4 S.Ct. 152, 28 L.Ed. 274]; United States v. Mosley [1915], 238 U.S. 383 [35 S.Ct. 904, 59 L.Ed. 1355]; United States v. Classic [1941], 313 U.S. 299, 314 [61 S.Ct. 1031, 1037, 85 L.Ed. 1368, 1377].

"There is nothing about federal and state employees as a class which justifies depriving them or society of the benefits of their participation in public affairs.  They, like other citizens, pay taxes and serve their country in peace and in war.  The taxes they pay and the wars in which they fight are determined by the elected spokesmen of all the people.  They come from the same homes, communities, schools, churches, and colleges as do the other citizens.  I think the Constitution guarantees to them the same right that other groups of good citizens have to engage in activities which decide who their elected representatives shall be.

"No statute of Congress has ever before attempted so drastically to stifle the spoken and written political utterances and lawful political activities of federal and state employees as a class.  The nearest approach was the Civil Service Act of 1883, 22 Stat. 403-4, which authorized the President to promulgate rules so that, among other things, no government employee should 'use his official authority or influence to coerce the political action of any person or body.'  In 1907, the Civil Service Commission, purporting to act under authority of the 1883 Act, did, as the Court points out, prohibit civil service employees from taking 'an active part in political management or in political campaigns.'  But

this Court has not approved the statutory power of the Commission to promulgate such a rule, nor has it ever expressly or by implication approved the constitutional validity of any such sweeping abridgment of the right of freedom of expression. Neither Ex parte Curtis [1882], 106 U.S. 371 [1 S.Ct. 381, 27 L.Ed. 232], nor United States v. Wurzbach [1930], 280 U.S. 396 [5 S.Ct. 167, 74 L.Ed. 508], lend the slightest support to the present statute. Both of these cases related to statutes which did no more than limit the right of employees to collect money from other employees for political purposes. Indeed, the Curtis decision seems implicitly to have rested on the assumption that many political activities of government employees, beyond merely voting and speaking secretly, would not, and could not under the Constitution, be impaired by the legislation there at issue. Ex parte Curtis, supra, at 375 [1 S.Ct. at 385-386, 27 L.Ed. at 235].

"It is argued that it is in the interest of clean politics to suppress political activities of federal and state employees. It would hardly seem to be imperative to muzzle millions of citizens because some of them, if left their constitutional freedoms, might corrupt the political process. All political corruption is not traceable to state and federal employees. Therefore, it is possible that other groups may later be compelled to sacrifice their right to participate in political activities for the protection of the purity of the Government of which they are a part." (Footnote omitted.)

In Williams v. Rhodes (1968), 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, 45 O.O.2d 236, the Supreme Court held that Ohio's restrictive elections laws were invidiously discriminating and violated the Equal Protection Clause because they gave two established parties an advantage over new parties. The court held that the state laws involved heavily burdened the right of individuals to associate for the advancement of political beliefs and the right of qualified voters to cast their votes effectively. The court found that the state had not shown a "compelling interest" justifying those burdens.

In Pickering v. Bd. of Edn. of Twp. High School Dist. 205 (1968), 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, the Supreme Court held that absent proof of false statements knowingly or recklessly made, a public school teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. The court held that the problem was "to arrive at a balance between the interests of the teacher, as a citizen, in commenting on matters of public concern and the interest of the State as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568, 88 S.Ct. at 1734-1735, 20 L.Ed.2d at 817.

"The Pickering balance requires full consideration of the government's interest in the effective and efficient fulfillment of the responsibilities to the public." Connick v. Myers (1983), 461 U.S. 138, 150, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708, 722.

In Bullock v. Carter (1972), 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92, the United States Supreme Court invalidated a Texas primary filing fee system as contravening the Equal Protection Clause of the Fourteenth Amendment. Chief Justice

Burger noted that the "Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."10 (Footnote omitted.) Id. at 142-143, 92 S.Ct. at 855-856, 31 L.Ed.2d at 99.

In Broadrick v. Oklahoma (1973), 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830, the Supreme Court sustained Oklahoma's "Little Hatch Act" against constitutional attack. The Act provided that no classified employee shall be a candidate for paid political office.

In Illinois State Bd. of Elections v. Socialist Workers Party (1979), 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230, there was a challenge to the state's requirement as to the number of signatures for nominating petitions. The claim was that the number established by law was excessive and prohibited new parties and independent candidates from participating in elections. Consistent with its previous cases, the Supreme Court stated the following at 184, 99 S.Ct. at 990, 59 L.Ed.2d at 241:

"Restrictions on access to the ballot burden two distinct and fundamental rights, 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.' Williams v. Rhodes, supra [(1968), 393 U.S.], at 30 [89 S.Ct. at 10, 21 L.Ed.2d at 31, 45 O.O.2d at 239]. The freedom to associate as a political party, a right we have recognized as fundamental * * *, has diminished practical value if the party can be kept off the ballot. Access restrictions also implicate the right to vote because, absent recourse to referendums, 'voters can assert their preferences only through candidates or parties or both.' * * * By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences. And for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure. * * *

"When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest. * * *" (Citation omitted.)

Further in that same vein, the court pointed out: "However, our previous opinions have also emphasized that 'even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,' * * * and we have required that States adopt the least drastic means to achieve their ends. * * * This requirement is particularly important where restrictions on access to the ballot are involved." (Citations omitted.) Id. 440 U.S. at 185, 99 S.Ct. at 991, 59 L.Ed.2d at 242. "[A]n election campaign is a means of disseminating ideas as well as attaining political office. * * * Overbroad restrictions on ballot access jeopardize this form of political expression." (Citations omitted.) Id. at 186, 99 S.Ct. at 991, 59 L.Ed.2d at 242.

In Elrod v. Burns (1976), 427 U.S. 347, 96 S.Ct. 2673, 49

L.Ed.2d 547, a plurality of the United States Supreme Court recognized that public employees retain a core First Amendment right to enjoy basic political associations, and the government must select the narrowest means in regulating that fundamental interest.

In Clements v. Fashing (1982), 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508, the court held that the Texas constitutional provision limiting judges from running for the legislature under certain circumstances did not violate a judge's First Amendment right as guaranteed by the Fourteenth Amendment. The court again reiterated that candidacy is not a fundamental right and classifications need only be drawn as to bear some rational relationship to a legitimate state end.

In a significant dissent joined by three of his brethren, Justice Brennan wrote the following:

"It is worth noting, however, that the plurality's analysis of the level of scrutiny to be applied to these restrictions gives too little consideration to the impact of our prior cases. Although we have never defined candidacy as a fundamental right, we have clearly recognized that restrictions on candidacy impinge on First Amendment rights of candidates and voters. See, e.g., Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 [99 S.Ct. 983, 990, 59 L.Ed.2d 230, 241] (1979); Lubin v. Panish, 415 U.S. 709, 716 [94 S.Ct. 1315, 1320, 39 L.Ed.2d 702, 708] (1974); American Party of Texas v. White, 415 U.S. 767 [94 S.Ct. 1296, 39 L.Ed.2d 744] (1974); Bullock v. Carter, 405 U.S. 134, 142-143 [92 S.Ct. 849, 855-856, 31 L.Ed.2d 92, 99] (1972); Williams v. Rhodes, 393 U.S. 23, 31 [89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31] (1968). With this consideration in mind, we have applied strict scrutiny in reviewing most restrictions on ballot access; thus we required the State to justify any discrimination with respect to candidacy with a showing that the differential treatment is 'necessary to further compelling state interests.' American Party of Texas v. White, supra, [415 U.S.] at 780 [94 S.Ct. at 1305, 30 L.Ed.2d at 760]. See, also, Bullock v. Carter, supra, at 144 [92 S.Ct. at 856, 31 L.Ed.2d at 100]. The plurality dismisses our prior cases as dealing with only two kinds of ballot access restrictions-- classifications based on wealth and classifications imposing burdens on new or small political parties or independent candidates. Ante, [457 U.S.] at 965-965 [102 S.Ct. at 2844-2844, 73 L.E.2d at 517-517]. But strict scrutiny was required in those cases because of their impact on the First Amendment rights of candidates and voters, see Storer v. Brown, 415 U.S. 724, 729 [94 S.Ct. 1274, 1278, 39 L.Ed.2d 714, 723] (1974), not because the class of candidates or voters that was burdened was somehow suspect. Compare Lubin v. Panish, 415 U.S., at 717-718 [94 S.Ct. at 1320-1321, 39 L.Ed.2d at 709-710], with id., at 719 [94 S.Ct. at 1321, 39 L.Ed.2d at 710] (Douglas, J., concurring) (strict scrutiny demanded because classification based on wealth). The plurality offers no explanation as to why the restrictions at issue here, which completely bar some candidates from running and require other candidates to give up their present employment, are less 'substantial' in their impact on candidates and their supporters than, for example, the $700 fee at issue in Lubin.

"In my view, some greater deference may be due the State because these restrictions affect only public employees, see Part II, infra, but this does not suggest that, in subjecting these classifications to equal protection scrutiny, we should completely disregard the vital interests of the candidates and the citizens who[m] they represent in a political campaign." (Emphasis sic.)  Id., 457 U.S. at 977, 102 S.Ct. at 2851, 73 L.Ed.2d at 525, fn. 2.

In Johnson v. Cushing (1980), 483 F.Supp. 608, the United States District Court for the Minnesota District held that the right to run for political office is a federal constitutional right and the employee properly stated a claim for relief under the civil rights statute.  Judge Lord wrote the following:

"B.   The Right to Candidacy

"Plaintiff also asserts a right to run for office.  This Court is asked to determine whether there is a constitutional right to run for political office; it is not asked to determine the importance of the right.  Therefore, this Court makes no determination one way or the other regarding whether the right to run is fundamental; fundamental or not, it is a federal Constitutional right.

"The First Circuit Court of Appeals, in Mancuso v. Taft, 476 F.2d 187 (1st Cir.1973), reasoned that the interest of the individual in running for public office is an interest protected by the First Amendment.  The Court therein stated:

"'The right to run for public office touches on two fundamental freedoms:  freedom of individual expression and freedom of association.  Freedom of expression guarantees to the individual the opportunity to write a letter to the local newspaper, speak out in a public park, distribute handbills advocating radical reform, or picket an official building to seek redress of grievances.  All of these activities are protected by the First Amendment if done in a manner consistent with a narrowly defined concept of public order and safety ***.  The choice of means will likely depend on the amount of time and energy the individual wishes to expend and on his perception as to the most effective method of projecting his message to the public.  But interest and commitment are evolving phenomena.  What is an effective means for protest at one point in time may not seem so effective at a later date.  The dilettante who participates in a picket line may decide to devote additional time and resources to his expressive activity.  As his commitment increases, the means of effective expression changes, but the expressive quality remains constant.  He may decide to lead the picket line, or to publish the newspaper.  At one point in time, he may decide that the most effective way to give expression to his views and to get the attention of an appropriate audience is to become a candidate for public office--means generally considered among the most appropriate for those desiring to effect change in our governmental systems.  He may seek to become a candidate by filing in a general election as an independent or by seeking the nomination of a political party.  And in the latter instance, the individual's expressive activity has two dimensions:  besides urging that his views be the views of the elected public official, he is also attempting to become a spokesman for a political party whose substantive program

extends beyond the particular office in question. But [the defendant city] has said that a certain type of its citizenry, the public employee, may not become a candidate and may not engage in any campaign activity that promotes himself as a candidate for public office. Thus, the city has stifled what may be the most important expression an individual can summon, namely that which he would be willing to effectuate, by means of concrete public action, were he to be selected by the voters.' Id. at 195-196 (emphasis added)." Id. at 612-613.

In support of its argument that there is no fundamental right to run for public office, appellee cites this court's opinion in State ex rel. Keefe v. Eyrich (1986), 22 Ohio St.3d 164, 22 OBR 252, 489 N.E.2d 259. In that case, this court held that the seventy-year age provision of Section 6(C), Article IV of the Ohio Constitution did not violate the Equal Protection Clause of the United States Constitution.

As authority for its statement that there is no fundamental right to run for public office, this court cited Snowden v. Hughes (1944), 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, which merely held that the right to become a candidate for state office is a right or privilege of state citizenship and not a federal right.

In dissenting, both Chief Justice Celebrezze and Justice A.W. Sweeney argued that the majority had misread prior United States Supreme Court precedent and that they would find the Ohio constitutional provision unconstitutional because it undercut the basic and fundamental rights of those who would vote for judges over seventy without demonstrating that the provision was necessary to serve a compelling interest of the state. In short, they dissented because the majority failed to apply a strict scrutiny analysis to this ballot access case.

While federal precedent is instructive, it must be remembered that the Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups. Arnold v. Cleveland (1993), 67 Ohio St.3d 35, 616 N.E.2d 163. One court has pointedly stated that "[w]hen a state court interprets the Constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights." Davenport v. Garcia (Tex.1992), 834 S.W.2d 4, at 12.

Professor Cass Sunstein, the Karl Llewellyn Professor of Jurisprudence at the University of Chicago, embraces the notion that the First Amendment difficulties should be resolved with reference to the Madisonian principles of free debate, political discourse, and civic participation. In other words, no government regulation of speech that promotes any of these Madisonian principles should be allowed absent an extremely strong government interest. Sunstein, Democracy and the Problem of Free Speech (1993).

I believe that this court should embrace the Sunstein view

and hold that our Ohio Constitution protects the rights of all of its citizens to seek political office, whether it be as a part- time village councilman or councilwoman or as a full-time state office holder, and that any restriction on that activity by the state must be justified by the demonstration of a compelling governmental interest.

The city of Cleveland long ago recognized the important free speech and associational interests which are implicated when political activity is restricted when its charter carefully restricted only classified employees from seeking political office.

I believe that due consideration can be given to the rights of a public employee to run for political office without disturbing the efficiency of government. No public employer need make any special accommodation for the employee who seeks some political office.

Effective local government depends upon grassroots support and participation by all interested community members. Given the limited compensation and part-time nature of many local elective offices, candidates inevitably find it necessary to retain full-time employment. Needlessly excluding public employees from this process strikes at the heart of democratic government and stifles a vocal segment of the community. Local government employees such as Painter should not be placed in the futile position of making an all-or-nothing choice between their jobs and their candidacies.

Footnote:
10. "The makers of the Constitution recognized that the nexus between the voter and candidate was practical as well as theoretical, that the state could restrict the scope of the franchise by simply imposing severe qualifications for candidacy.

"During the debates of the fourteenth and fifteenth amendments, the right to vote and the right to be a candidate were frequently treated not as distinct constitutional concepts, but rather as a single broad political right--'the right to vote and hold office.' Although both the Senate and House versions of the fifteenth amendment originally contained a prohibition against denial or abridgment of the 'right to vote and hold office' on racial grounds, the final version returned from conference extended protection only to the franchise. * * * Some Senators were undisturbed by the alteration because they thought that protection of the right to vote would effectively protect the right to hold office as well." (Footnotes omitted.) Comment, Durational Residence Requirements for Candidates (1973), 40 U.Chi.L.Rev. 357, 366.