OPINION
Appellant Tonya Blair appeals the September 28, 2001 judgment entry of the Court of Common Pleas of Union County, Ohio, granting summary judgment in favor of the appellee, Honda of America Mfg., Inc. (hereinafter "Honda").
The facts of this case are as follows. Tonya Blair began working for Honda in 1987. She held various positions with Honda and eventually began working in Honda's Marysville, Ohio plant. Sometime in November of 1997, while working in a portion of the plant's assembly line that required working around carpet and insulation, commonly known as the in-panel sub area, Blair suddenly began sneezing and coughing, had difficulty breathing, and her skin became hot and blotchy. As a result of these conditions, she was moved to another area of the plant, and her doctor diagnosed her with an allergy to carpet. Honda was notified of this condition by way of a form entitled "Honda of America Mfg., Inc. Work Capacity Form." This form, signed by a Dr. Kratz, provided that Blair should not work around carpeting and listed allergic rhinitis as the diagnosis. The form also included a section that stated that these restrictions began on November 12, 1997, and were permanent. Blair also provided a note from Dr. Kratz's office, which stated that she was restricted from working around carpeting. This note was dated November 11, 1997, and Honda received it on November 13, 1997.
In October of 1998, Honda received another work capacity form regarding Blair. This form was signed by a Dr. Coleman, and listed the diagnosis as allergic rhinitis and dermatitis. The comments on the form stated that Blair was not to handle carpet, lie on carpet, or use green or pink soap (used in a portion of Honda's assembly line), and listed a Dr. Miller as the one clarifying Blair's restrictions. The stated dates of restriction were from October 13, 1998, until January 13, 1999. Blair also furnished Honda with a note, dated October 15, 1998, from Dr. Miller's office, which provided that "Insulation from instrument panel should be considered as like carpet should be included in her restrictions — final word to be decided."
Throughout 1999, Blair had various absences for different illnesses, including over two months for a work-related knee injury. In December of 1999, Blair was placed in the attendance improvement program (AIP) at Honda. As part of the terms of the AIP, Blair was not allowed to have more than two occurrences (uncovered absences) from December 23, 1999, through February 22, 2000, or else she would be terminated. From December 31, 1999, until January 19, 2000, Blair was on approved medical leave from Honda because she had an upper respiratory infection, temporomandibular disease (TMJ), and an ear infection. She attempted to return to work on January 10, 2000, but left before completing her shift because she was ill.
Upon returning on January 19, 2000, Blair was told to wait in the cafeteria until someone came for her to assign her to a line in the plant. Eventually she was brought to the in-panel sub area and told that this is where she would be working. Blair immediately stated that she could not work in that area because she had restrictions due to suffering from allergies, which were triggered by substances located in the in-panel sub area, which included carpeting and insulation. Doug Bigler, who was a project leader for ergonomics and restriction management and assembly at Honda at that time, then examined her current restrictions. At that time, Honda's computers listed only restrictions regarding Blair's knee as current restrictions for her, not her allergy-related restrictions. Blair was then told that Honda did not recognize permanent restrictions and was offered gloves to wear while she worked, but she stated that this would not be sufficient. Rick Clark, who worked in medical restriction management at Honda, determined that Blair should at least attempt to work in the area.
At some point, Blair began coughing and experienced trouble breathing. She then informed Bigler that she could not stay in that area because she did not feel good and did not want to further complicate the respiratory infection that she was attempting to overcome. Blair went to the leave department, requested a medical leave packet, and was not given one. She then went home, called her doctor's office, and sought medical treatment the following day. At no point on January 19, 2000, did she actually perform any work for Honda.
On January 20, 2000, Blair went to her doctor's office. The doctor examined her, gave her an allergy shot, and then told her to not go into work the rest of the day and to stay at home the following day. On January 24, 2000, Blair returned to Honda with a note from the doctor's office, covering January 19-21, 2000, and stating a return to work date of January 24, 2000. On this note was a space to indicate the nature of the illness or injury. Blair admits that she was the one who wrote "upper respiratory, ear infection, TMJ" in this space as it was left blank by the doctor's office. In addition, Blair submitted a work capacity form to Honda, dated January 20, 2000, and signed by Dr. Miller, which stated that she should not be required to work around insulation, stuck-o-pad, or carpet and that such restrictions were permanent. This form was received by Honda on January 24, 2000.
Blair was assigned to an area of Honda's plant that satisfied all of her restrictions, both knee and allergy related. She completed her shift that day without incident. The following day, January 25, 2000, Rod Sewer, an associate relations representative for Honda, called Blair to inform her that her most recent sick leave was being investigated and that she was not to return to work until the investigation was complete. On January 31, 2000, Rod Sewer again called Blair. During this conversation, Sewer informed Blair that she was terminated from her employment with Honda and that she had the option of going before a review panel to attempt to be reinstated. Blair opted for a review panel. The review took place on February 7, 2000, and at that time, both Blair and Sewer were permitted to state their respective positions. The review panel upheld Blair's termination.
On February 8, 2001, Tonya Blair filed a complaint against Honda, alleging breach of contract, employer intentional tort, and wrongful discharge in violation of Ohio public policy. Blair later filed a motion for leave to file an amended complaint on August 2, 2001, and this motion was granted by the trial court on August 13, 2001. Blair's amended complaint alleged only wrongful discharge in violation of Ohio public policy. Thereafter, Honda made a motion for summary judgment on September 5, 2001. The trial court granted Honda's motion for summary judgment on September 28, 2001. This appeal followed, and Blair now asserts one assignment of error.
 The Trial Court erred as a matter of law by granting Appellee's Motion for Summary Judgment.
The standard for review of a grant of summary judgment is one of de novo review. Lorain Nat'l Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129. Thus, such a grant will be affirmed only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In addition, "summary judgment shall not be rendered unless it appears * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence construed most strongly in his favor." Id.
The moving party may make his motion for summary judgment in his favor "with or without supporting affidavits[.]" Civ.R. 56(B). However, "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." Mitseff v. Wheeler (1988),38 Ohio St.3d 112, syllabus. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmovant. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,360. Once the moving party demonstrates that he is entitled to summary judgment, the burden then shifts to the non-moving party to show why summary judgment in favor of the moving party should not be had. See Civ.R. 56(E). In fact, "[i]f he does not so respond, summary judgment, if appropriate, shall be entered against him." Id.
Ohio employment law is based on the general premise that all employment is considered at-will, whereby either party may terminate the employment relationship for whatever reason and whenever either so desires. Mersv. Dispatch Printing Co. (1985), 19 Ohio St.3d 100. However, this doctrine has been limited by various statutes, constitutional amendments, and case law. For example, an employer may not terminate an employee because of his/her race, color, or religion. See R.C. 4112.02. The Ohio Supreme Court has specifically determined that "[p]ublic policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." Greeley v. Miami Valley Maintenance Contractors, Inc. (1990),49 Ohio St.3d 228, paragraph one of the syllabus. Thus, the Court permits wrongfully discharged employees "a cause of action for wrongful discharge in violation of public policy" in tort. Id. at paragraph three of the syllabus. In furtherance of the principles adopted in Greeley, the Court has also determined that
 an exception to the employment-at-will doctrine is justified where an employer has discharged his employee in contravention of a "sufficiently clear public policy." The existence of such a public policy may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law.
Painter v. Graley (1994), 70 Ohio St.3d 377, 384.
When asserting a claim for wrongful discharge in violation of public policy, a plaintiff must first demonstrate that "`clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).'"Collins v. Rizkana (1995), 73 Ohio St.3d 65, 69 (quoting Painter,70 Ohio St.3d at 384, fn. 8). Second, the plaintiff must show "`[t]hat dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).'"Id. at 70 (quoting Painter, supra). Both of these elements "are questions of law to be determined by the court." Collins,73 Ohio St.3d at 70 (citing H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 401).
The plaintiff must also demonstrate two other elements, both of which involve questions of fact. The first of these is that "`[t]he plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).'" Collins, 70 Ohio St.3d at 70 (quotingPainter, supra). The second of these is that "[t]he employer lacked overriding legitimate business justification for the dismissal (theoverriding justification element)." Id.
The primary dispute between the parties in the case sub judice is whether Blair's termination was in violation of a clear public policy. Honda maintains that it terminated Blair based upon two reasons. The first is that Blair had more than two occurrences within the specified time period for the AIP. Both parties agree that when one of Honda's employees does not go to work or leaves early, the time must be covered or else it is considered an occurrence. There are various ways to "cover" for lost time. Employees are given sick days and vacation days that they may use. They are also allowed leave in accordance with the Family and Medical Leave Act (FMLA) and may also request leaves of absence for various reasons, such as family leave, medical leave, and/or educational leave.
Honda maintains that when Blair left early on January 10, 2000, and this time was not covered, that action constituted her first occurrence. Her second occurrence happened when she left on January 19, 2000, according to Honda. Honda then asserts that January 20, 2000, constituted her third occurrence, prompting her termination, and January 21, 2000, was yet her fourth occurrence, as none of these days were covered.
When Blair left Honda on January 10, 2000, she did not have any sick days or vacation days left. The same is true when she left work on January 19, 2000, and did not return until January 24, 2000. She also did not meet the requirements for leave under the FMLA on either of these occasions. Therefore, the only way that she could cover for January 19-21, 2000, was by obtaining medical leave from Honda. Honda's policy states the following in regards to medical leave.
 Medical Leave Leave of absence for associates who are incapacitated from working due to health-related conditions.
 All medical leave requests that are eligible and qualifying will be designated as Family and Medical Leave Act (FMLA) leaves.
 Medical leaves that are not FMLA-eligible leaves must involve an incapacity that lasts at least three (3) consecutive workdays.
 Complete medical certification (medical facts about condition, start and end dates of incapacity, treatment, and treatment dates) must be provided.
 In cases where an intermittent FMLA leave is approved, reasonable efforts must be made to arrange the least disruptive schedule.
Although Honda disputes the authenticity of Blair s medical documentation, which this Court will address in its discussion of the overriding justification element, she did submit medical documentation from her doctor providing an excuse from work for January 19, 20, and 21, 2000. While arguably Blair was absent from work for two full days and only part of January 19, 2000, she did not actually perform any work on the nineteenth and became ill shortly after arriving in the in-panel sub area. In addition, Dale Sparlin, who worked in Honda's leave coordination department, testified during his deposition that there have been times when an associate has clocked in at work, not actually worked, and clocked out with Honda considering this a full day of incapacitation for medical leave purposes, which is precisely what Blair did on January 19, 2000. Thus, reasonable minds could differ as to whether this should have been considered a full day of incapacitation. If it was, then Blair was incapacitated for three days and should have been allowed medical leave according to Honda's own policy. Had Blair been given medical leave, then none of these days would have been considered occurrences, thus no AIP violation.
Despite these problems, Blair must still identify how her termination violated public policy. Blair maintains that she would not have had the January 19-21, 2000 occurrences were it not for Honda's insistence that she work in an area that caused her physical harm. In other words, by requiring her to work in the in-panel sub area, an area wherein allergen-causing particles were located, Honda forced her to choose between her health or her job. The Ohio Supreme Court has determined that "[t]he public policy of this state demands that employees be provided with a safe work environment and that unsafe working conditions be corrected." Kulch v. Structural Fibers, Inc. (1997),78 Ohio St.3d 134, 152. The Court found that various statutes and constitutional provisions reflect such a policy, including R.C. 4101.11
(duty of employer to protect employees and frequenters), and R.C. 4101.12
(duty of employer to furnish safe place of employment). Id.
Although Honda's in-panel sub area was not necessarily an unsafe work environment for the majority of Honda's employees, it was for Blair, and Honda had knowledge of this. Despite this knowledge and over Blair's protests, Honda required Blair to work in this area even after she began suffering from her allergies upon being in the area for a brief amount of time. However, Honda contends that it did not subject her to an unsafe work environment because its computer records reflected that her restrictions relating to this area were expired. This argument ignores the fact that Honda did not provide a safe work environment for Blair when it was, in fact, aware that she suffered from allergies caused by materials used in this area, regardless of whether its computers reflected this condition.
Blair's restrictions were expired because Honda instituted a policy whereby restrictions only lasted three months, at which time the employee was responsible for updating any necessary restrictions. However, what Honda's computer reflects is not the sole basis for knowledge on its part. On more than one occasion Blair submitted medical documentation of her carpet/insulation related allergies, including the fact that this was a permanent condition. Doug Bigler also testified that he knew that Blair suffered from allergies due to carpet and insulation, yet he still wanted her to work in that area. In addition, Rick Clark testified that he discovered that Blair at one time had allergy-related restrictions relating to the materials used in the in-panel sub area. Moreover, Blair told both Clark and Bigler about her allergies and that she was currently experiencing problems after having been in the area for only a short while. The fact that Blair did not update her restrictions does not negate Honda's knowledge of the safety hazard posed to Blair by being compelled to work in an area that had harmed her in the past. Therefore, there is a genuine issue of material fact as to whether Honda subjected Blair to an area that was unsafe for her and did not attempt to find an area in which she could work without harm.
When construing the facts in a light most favorably to Blair, her termination was triggered by the events of January 19, 2000. Reasonable minds could conclude that she left Honda that day because her exposure to the in-panel sub area caused her to become ill, and Honda was still requiring her to work in that area. Thereafter, she sought medical treatment from her doctor, who then told her not to work on January 20, 2000, and January 21, 2000. Her doctor also provided a note to cover January 19, 2000, the date on which she was exposed to allergens. Had she not been exposed to the in-panel sub area on January 19, 2000, she would not have suffered from her allergies and would not have left that day. Additionally, were it not for the January 19, 2000 exposure, she would not have missed work on January 20, 2000, her third occurrence, or January 21, 2000, her fourth occurrence. Thus, in choosing to terminate Blair for these occurrences, a genuine issue of material fact is raised as to whether Honda violated the public policy of providing a safe work environment.
However, our analysis does not end here. Blair must also demonstrate the jeopardy element. We find that to allow Honda to terminate Blair for missing work due to an illness caused by its decision to require her to work in an unsafe environment would jeopardize the public policy that demands that employees be provided with a safe work environment.
As to the causation element, we find that genuine issues of material fact exist as to whether Blair's dismissal was motivated by her choice to leave Honda on January 19, 2000, and to follow her doctor's orders to not return on January 20, 2000, and January 21, 2000. As previously discussed, reasonable minds could conclude that her absences were triggered by the events on January 19, 2000, and that had it not been for her allergic reaction and subsequent need to recover, she would not have been terminated.
The last element that Blair must demonstrate is that Honda lacked an overriding legitimate business justification for terminating her. This element involves Honda's second stated reason for terminating Blair, which is that Blair falsified medical documents that she submitted to Honda, which is a violation of Honda policy. The policy states in pertinent part that an employee must not misrepresent facts or falsify medical records. Honda contends that Blair falsified her doctor's note that she submitted on January 24, 2000, by writing the nature of her illness rather than having the doctor writing that information. Although Blair admits that she wrote that information, she asserts that she did so in front of one of the employees in the medical department at Honda only after being told by that employee that the department needed that information, and she contends that her actions went unquestioned by the employee. Moreover, Honda does not maintain that the information that Blair provided was false or misrepresented her condition nor did it question the accuracy of this information. Therefore, whether Blair violated Honda's policy regarding the doctor's note is unclear, and thus, genuine issues of material fact exist as to whether Blair was properly terminated for this reason.
Additionally, Honda asserts that Blair further falsified medical documents by changing the return to work date on the doctor's note from January 21, 2000, to that of January 24, 2000. However, Honda was unable to determine from the communications with Blair's doctor's office whether the date was originally January 21, 2000, or January 24, 2000. Documentation from Blair's doctor did reveal that he had provided her a work excuse from January 19, 2000 to January 21, 2000. Thus, there are genuine issues as to whether the note was altered, and if so, who was responsible for such changes. As such, there is a genuine issue of material fact as to whether Honda can rely upon this information as an independent justification for its dismissal of Blair.
In summary, this Court finds that there is a clear public policy of workplace safety. Additionally, we find that to terminate an employee who chooses not to work in an area that she and her employer know is unsafe for her would jeopardize this public policy. Finally, it is our conclusion that genuine issues of material fact exist as to whether Blair's termination was motivated by her conduct relating to her safety and whether Honda had an overriding legitimate business justification for Blair's dismissal. Therefore, the grant of summary judgment was inappropriate.
For all of these reason, Blair's assignment of error is sustained. It is the order of this Court that the judgment of the Common Pleas Court of Union County, Ohio, is hereby reversed and remanded for further disposition in accordance with the foregoing opinion.
Judgment Reversed and Cause Remanded.
BRYANT and WALTERS, J.J., concur.