[Cite as *Wright v. Therm-O-Link*, 2016-Ohio-7840.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**PORTAGE COUNTY, OHIO**

| | | |
|---|---|---|
| RICHARD WRIGHT, et al., | : | **O P I N I O N** |
| Plaintiffs-Appellants, | : | |
| - vs - | : | **CASE NO. 2015-P-0059** |
| THERM-O-LINK, | : | |
| Defendant-Appellee. | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2012 CV 01193.

Judgment: Affirmed.

*Steven W. Albert*, 29425 Chagrin Boulevard, Suite 216, Pepper Pike, Ohio 44122, and *James G. Joseph*, 75 Public Square, Suite 650, Cleveland, OH 44113 (For Plaintiffs-Appellants).

*Matthew M. Ries*, and *Kevin P. Murphy*, Harrington, Hoppe & Mitchell, Ltd., 108 Main Avenue, S.W., Suite 500, Warren, OH 44481 (For Defendant-Appellee).

THOMAS R. WRIGHT, J.

{¶1} This appeal is from the final decision in an intentional tort case. Appellants, Richard and Reille Wright, claim the trial court erred in granting summary judgment in favor of appellee, Therm-O-Link, Inc., on all pending claims. For the following reasons, summary judgment was proper.

{¶2} Appellee is an extrusion wire factory, with its principal place of business in

Garrettsville, Portage County, Ohio. The factory manufactures insulated electrical wire products, primarily used in the automobile industry. The factory is comprised of various extrusion machines that apply insulation to bare wire or cable. One such machine is known as the "battery line" or "BY1." As the names suggests, this machine primarily produces battery cables.

{¶3} The BY1 machine consists of three sections, the second of which is called the "caterpuller." The caterpuller has two side-by-side conveyor belts, spaced a small distance apart. When the BY1 machine is on, the conveyor belts run continuously at a high rate of speed. After the wire or cable is removed from big containers or spools during the machine's first segment, it is directed toward the opening of the caterpuller, where there are two small rollers. In order for the wire to go between the two conveyor belts, it must go between the two rollers. The conveyor belts propel the wire toward the extrusion head, where the process of applying the insulation begins.

{¶4} In addition to guiding the wire as it moves toward the extrusion head, the caterpuller also maintains the proper tension on the wire so that there is no slack. If any slack develops either before or after the wire enters the caterpuller, the wire is unlikely to go between the two conveyor belts in the proper manner and it may become necessary to turn off the entire machine so that the wire can be re-positioned. Moreover, if the wire does not go through the caterpuller properly, the insulation process is adversely affected necessitating the insulation to be scraped from the wire.

{¶5} Immediately outside the opening to the caterpuller is a safety guard sitting directly above the moving wire. When properly positioned, it blocks objects resting upon the wire from being pulled into the caterpuller toward the "pinchpoint" of the two

conveyor belts. However, the placement of the safety guard also inhibits the machine operator's ability to see whether the wire is properly going between two posts and toward the conveyor belts. To alleviate this issue, the operator can lift the safety guard away from the wire while the machine is still running. Also, attached to the guard is a separate small wire that the operator can use to lock the guard out of the "safety" position.

{¶6} Appellee's employee handbook expressly provides that all safety guards must be properly positioned when a machine is operating. Nevertheless, appellee requires its employees to operate the machine as efficiently as possible, producing the greatest amount of insulated wire and the least amount of scrape.

{¶7} In relation to machine operators, appellee prohibits possession of cell phones inside the factory. The policy is set forth in the employee handbook, and is orally explained to every new hire at the outset of his employment. In addition, each new hire is required to execute a written statement acknowledging that he was informed of the company's cell phone policy. The no cell phone policy rule is zero tolerance-- possession of a cell phone results in immediate termination.

{¶8} Appellee hired Richard Wright as a machine operator in February 2011, and immediately assigned him to the BY1 machine. Over at least the first six weeks of employment, Richard was trained by a senior operator with prior experience on the BY1 machine. While the majority of the training was "hands-on," Richard was required to take a written test at the close of the training. According to the senior operator, he emphasized that the safety guard should always be in the "down" position whenever the conveyor belts are running.

{¶9} Once his training was completed, Richard became the sole operator of the BY1 machine. On December 15, 2011, near the conclusion of his shift, Richard noticed that the spool of wire he was sending through the machine would soon be empty. Consistent with typical procedure, he tied the end of the wire on the present spool to the leading edge of the wire on the spool for the next job. Based upon his prior experience, Richard was aware that the wire could become slack as the knot connecting the two spools entered the caterpuller. As a result, he was running the BY1 machine with the safety guard "up" so that he could watch the knot as it moved through the two rollers.

{¶10} Due to a problem with the wire, slack developed, and the wire was no longer moving between the two rollers. After fixing the problem with the spool, Richard tried to re-position the moving wire between the rollers by pushing down on the wire. When his first attempt failed, he placed his left hand behind the rollers, in the area of the caterpuller between the rollers and the conveyor belts, and again tried to push down on the wire. As he did so, his left hand got caught on the moving wire and was pulled into the narrow pinchpoint between the moving conveyor belts.

{¶11} Richard sustained serious injury to his left hand, including three broken fingers. While receiving treatment at a local hospital, he gave a statement regarding the incident to appellee's human resource administrator. His statement resulted in a written report, spurring an internal investigation into the matter by appellee. As a direct result, the character of the guard was changed to a transparent material allowing the operator to see the wire going into the caterpuller even with the guard down.

{¶12} While recovering from his injury, Richard filed a complaint concerning the incident with OSHA. Upon conducting an on-site inspection of the BY1 machine, OSHA

4

issued a report finding multiple safety violations. As to the caterpuller, the report found that appellee had not placed adequate safety guards in the area around the rollers and conveyor belts. Therefore, appellee was fined and required to take additional remedial measures.

{¶13} Within two months of his injury, Richard returned to work on light duty. A short time later, he returned to regular duty as a machine operator. However, on April 4, 2012, Richard's cell phone was found in a desk near his work area. The cell phone was confiscated without his knowledge, and he was told to report to appellee's director of human resources. When confronted with the phone, Richard admitted that it was his, and executed a written verification that his phone was found inside the factory premises. His employment was terminated.

{¶14} Within six months of termination, Richard and his wife, appellants, filed the underlying civil action against appellee. In addition to a claim for loss of consortium, their complaint asserts claims for intentional tort under R.C. 2745.01 and for wrongful discharge in violation of public policy. In relation to the wrongful discharge claim, their complaint made no reference to the whistleblower statute under R.C. 4113.52; instead, only a common law cause of action was raised.

{¶15} Following lengthy discovery, appellee moved for summary judgment on the entire complaint. As to the intentional tort claim, appellee contended that the undisputed facts support the conclusion that it did not act with a deliberate intent to injure Richard. The motion stressed that the injury took place while the safety guard was not in the proper position, that Richard had been instructed to always run the BY1 machine with the safety guard down, and that no other employee had been injured on

5

the machine in over twenty-five years. Concerning the wrongful discharge claim, appellee argued that appellants could not establish that the termination was in retaliation for the filing of the OHSA complaint because the company had a legitimate business reason to fire Richard, violation of its cell phone policy. In support, appellee established that twelve other employees had previously been fired for the same reason.

{¶16} In response to appellee's motion, appellants maintain that, under R.C. 2745.01(A) & (B), summary judgment on the intentional tort claim is improper because of a substantial certainty that a person would suffer an injury while operating the BY1 machine. In advancing substantial certainty, they submitted the affidavit of Michael Adams, a professor of mechanical engineering and a safety expert. Adams opined that the injury to Richard was a substantial certainty because: (1) there were inadequate safety guards near the "pinchpoint" where the two conveyor belts come together inside the caterpuller; (2) Richard did not receive adequate training; and (3) the work environment was too pressurized due to the emphasis placed upon productivity. As to the wrongful discharge claim, appellants asserted that a jury could find that the cell phone violation was pretextual because his supervisor had seen his cell phone inside the factory on prior occasions, and nothing had ever been done about it until after he filed his OSHA complaint.

{¶17} In granting summary judgment in favor of appellee on all pending claims, the trial court first held that appellants could not satisfy the statutory standard for an intentional tort because they did not present any evidence that appellee knowingly allowed him to operate the BY1 machine with the safety guard in the "up" position. Second, the court concluded that appellants could not prevail on the wrongful discharge

6

claim because they could not contradict appellee's evidence that twelve other employees were previously discharged for violating the company's cell phone policy.

**{¶18}** On appeal from this decision, appellants state two assignments of error:

**{¶19}** "[1.] The trial court erred when it granted defendant/appellee's motion for summary judgment dismissing Count I, employer's intentional tort, of plaintiffs' complaint holding there was no factual issue to be decided by a jury.

**{¶20}** "[2.] The trial court erred when it granted defendant/appellee's motion for summary judgment dismissing Count II, retaliatory discharge, of plaintiffs' complaint holding there were no factual issues for the jury to decide."

**{¶21}** Under their first assignment, appellants raise a legal issue concerning the proper interpretation of R.C. 2745.01, governing employer civil liability for an intentional tort. Appellants contend the statute provides two alternate ways to establish intentional tort: (1) an intent to injure; or (2) the existence of a substantial certainty that an injury would occur.

**{¶22}** Relevant to discussion, R.C. 2745.01 states:

**{¶23}** "(A) In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

**{¶24}** "(B) As used in this section, 'substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a

condition, or death."

{¶25} In support of this argument, appellants theorize that if an employee demonstrates that the underlying injury was substantially certain to occur, subsection (B) allows a jury to infer that the employer acted with a deliberate intent. Appellants further submit that the proper interpretation of the "substantially certain" language is still a question of first impression not yet addressed by the Supreme Court of Ohio.

{¶26} The Supreme Court, however, has expressly held that R.C. 2745.01 sets forth but one way to establish an intentional tort. In *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, the appellate court held that proof of an intent to cause injury was the sole means of demonstrating an intentional tort. On review, the Supreme Court began its analysis by quoting the appellate decision:

{¶27} ""Intent to injure" is clear and, therefore, is not defined in the statute. "Substantially certain," however, is not as clear. Therefore, the legislature provided a definition. R.C. 2745.01(B) defines "substantially certain" as acting "with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death."'

{¶28} "'When we consider the definition of "substantial certainty," it becomes apparent that an employee does not have two ways to prove an intentional tort as R.C. 2745.01(A) suggests. The employee's two options of proof become: (1) the employer acted with intent to injure or (2) the employer acted with deliberate intent to injure. Thus, under R.C. 2745.01, the only way an employee can recover is if the employer acted with the in intent to cause injury.' *Kaminski*, 175 Ohio App.3d 227, 2008-Ohio-1521, 886 N.E.2d 262, ¶[30-31].

8

**{¶29}** "As an initial matter, we agree with the court of appeals that the General Assembly's intent in enacting R.C. 2745.01, as expressed particularly in 2745.01(B), is to permit recovery for employer intentional torts only when an employer acts with specific intent to cause an injury, subject to subsections (C) and (D). See *Talik v. Fed. Marine Terminals, Inc.*, 117 Ohio St.3d 496, 2008-Ohio-937, 885 N.E.2d 204, ¶17 (the General Assembly in R.C. 2745.01 'modified the common-law definition of an employer intentional tort' by rejecting 'the notion that acting with a belief that injury is substantially certain to occur is analogous to wanton misconduct'). See also *Stetter [v. R.J. Corman Derailment Servs., L.C.C.]*, 125 Ohio St.3d 280, 2010-Ohio-1029, 927 N.E.2d 1092, at paragraph three of the syllabus, in which we hold that R.C. 2745.01 does not eliminate the common-law cause of action for an employer intentional tort." *Id.* at ¶54-56.

**{¶30}** *Kaminski* was restated and followed by the Supreme Court in *Cincinnati Ins. Co. v. DTJ Enters,*, 143 Ohio St.3d 197, 2015-Ohio-843, 36 N.E.3d 122, ¶10.

**{¶31}** In this case, appellants do not attempt to argue that the averments in Dr. Adams's affidavit are sufficient to establish that appellee acted with deliberate intent to cause the injury to Richard's hand. Instead, they maintain that the averments tend to show that the injury was substantially certain to occur. Given actual intent is required, appellants' argument fails since Adams's averments and are, at best, only sufficient to establish wanton misconduct by an employer, not intent. *Wright v. Mar-Bal Inc.*, 11th Dist. Geauga No. 2012-G-3112, 2013-Ohio-5647, ¶28, (inadequate training and the lack of adequate safety guards are insufficient to show a deliberate intent to cause an injury).

**{¶32}** As the trial court correctly granted summary judgment, appellants' first assignment lacks merit.

9

{¶33} Under their second assignment, appellants argue that summary judgment should not have been granted on the wrongful discharge claim because their evidentiary materials create an issue of fact as to whether appellee violated R.C. 4113.52, the whistleblower statute. They assert that, since there is no dispute that he was fired shortly after filing a complaint with OSHA, a jury could infer that his employment was terminated for that reason rather than the pretextual firing for violating the cell phone policy.

{¶34} Appellants' entire argument at the appellate level is based upon the underlying assertion that the wrongful discharge claim was predicated upon a violation of the whistleblower statute. But this argument was not advanced before the trial court. The allegations in their complaint expressly state that they are maintaining a common-law claim of wrongful discharge in violation of public policy. Moreover, appellants did not move the trial court for leave to amend the wrongful discharge claim.

{¶35} In their response to the motion for summary judgment, appellants made reference to the whistleblower statute. However, the reference was only for the purpose of establishing the existence of a public policy protecting an employee from retaliation for filing an OSHA complaint. Appellants did not attempt to show that they could satisfy the elements for a claim under R.C. 4113.52. Thus, they are foreclosed from now asserting that they should have been permitted to proceed on the wrongful statutory discharge claim.

{¶36} Given that appellants alleged that Richard was fired as a direct result of his decision to file an OHSA complaint, they could have gone forward under the whistleblower statute. R.C. 4113.52(B) forbids an employer from taking retaliatory

action against an employee who files a report regarding a possible violation of a state or federal statute that is likely to cause an imminent risk of physical harm to a person or the public. Nevertheless, R.C. 4113.52 does not preclude them from proceeding on a common law wrongful discharge claim in violation of public policy. An employee can still bring the common-law claim "if he can identify a source of public policy separate from the public policy embodied in R.C. 4113.52." *Doody v. Centerior Energy Corp.*, 137 Ohio App.3d 673, 679, 739 N.E.2d 851 (11th Dist.2000), citing *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 162, 677 N.E.2d 308 (1997).

{¶37} To prevail on a claim for wrongful discharge in violation of public policy, the plaintiff must prove: "'"1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element). 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element). 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element). 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)." (Emphasis *sic*.)'" *Doody*, 137 Ohio App.3d at 680, quoting *Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51 (1994), fn. 8.

{¶38} In discussing appellants' wrongful discharge claim, the trial court did not expressly refer to any of the four elements. Rather, the court only held that summary judgment was appropriate because appellants were unable to refute the fact that appellee had previously terminated twelve employees for the same reason Richard was fired: i.e., violation of the company's "no cell phone" policy. Given this, it is clear the trial

11

court concluded that appellants failed to satisfy the overriding justification element.

**{¶39}** In relation to such, as in discrimination cases, a burden shifting frame work is followed. *Sells v. Holiday Mgmt.*, 10th Dist. Franklin No. 11AP-205, 2011-Ohio-5974, ¶21-22, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This framework has three steps: (1) the plaintiff must first establish a prima facie case, creating a presumption that the discharge was improper; (2) the burden of production then shifts to the defendant to present evidence of an overriding legitimate business justification for its actions; and (3) if the defendant carries its burden, the presumption no longer applies and the plaintiff has the final burden of proving that the defendant's justification was just a pretext for its decision to terminate. *Id.*

**{¶40}** In this case, there is no dispute that Richard was terminated within two months of the filing of his OHSA complaint; therefore, appellants established a prima facie case that the discharge was improper. Appellee, however, carried its burden of demonstrating an overriding legitimate business justification for the termination. There is no dispute that Richard was informed of the cell phone policy when he was hired, that he admitted that he had his cell phone inside the factory, and that appellee had previously enforced the policy by firing twelve other employees. Therefore, the question becomes whether appellants presented any evidence showing that appellee's reliance upon the cell phone policy was a pretext.

**{¶41}** In support of their pretext argument, appellants assert that Richard previously brought his cell phone into the factory, and that his immediate supervisor was aware. In deposition, Richard testified that his immediate supervisor had used his cell phone to time the speed of another machine. However, there is no evidence his

12

immediate supervisor had the authority to fire him for the cell phone violation.  More importantly, there is no evidence that anyone with the authority to terminate Richard's employment was aware of his prior violations and chose not to enforce the company's policy.  Thus, appellants' evidence was not sufficient to establish a pretext.

{¶42} Based on the foregoing, appellant's second assignment is without merit and the judgment of the trial court is affirmed.


DIANE V. GRENDELL, J.,

TIMOTHY P. CANNON, J.,

concur.